Diana S. Cline, Esq.
Cline Legal Solutions LLC
7625 Dean Martin Drive Suite 115
Las Vegas, NV 89139
702-721-9434
Email: diana@clinelegalnv.com
PRO HAC VICE

Ron Im Ruangtragool
Sila Law APC
113 N San Vicente Blvd, Ste 381
Beverly Hills, CA 90211
888-807-2550
Email: ron@sila.law
Local Counsel

Attorneys for Plaintiffs AARON GUHIN and RON RUANGTRAGOOL

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

AARON GUHIN and RON RUANGTRAGOOL,

Plaintiffs,

v.

NORTHLAND THEA PORTFOLIO LLC; NORTHLAND THEA LLC; NORTHLAND THEA PORTFOLIO II, LLC; NORTHLAND THEA PORTFOLIO III, LLC; NORTHLAND THEA IV LLC; NORTHLAND INVESTMENT CORPORATION; GREYSTAR CALIFORNIA, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; GREYSTAR MANAGEMENT SERVICES, LLC; and MATTHEW GOTTESDIENER,

Defendants.

Case No.: 2:26-cv-03409-HDV-ACCV
District Judge: Hon. Hernan D. Vera

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RELATED RELIEF**

(1) Agreement in Restraint of Trade (Sherman Act, 15 U.S.C. § 1); (2) Combination in Restraint of Trade (Bus. & Prof. Code, § 16720); (3) Statutory Breach of the Implied Warranty of Habitability (Civ. Code, §§ 1941, 1941.1 et seq.); (4) Tortious Breach of the Implied Warranty of Habitability; (5) Breach of the Covenant of Quiet Enjoyment (Civ. Code, § 1927); (6) Wrongful Constructive Eviction; (7) Breach of Written Lease and Express Agreements; (8) Breach of the Implied Covenant of Good Faith and Fair Dealing; (9) Private Nuisance (Civ. Code, § 3479); (10) Negligent Damage to Personal Property (Civ. Code, § 1714); (11) Breach of Bailment (Civ. Code, § 1814 et seq.); (12) Trespass; (13) Demanding Rent for an Untenantable Dwelling (Civ. Code, § 1942.4); (14) Retaliation (Civ. Code, § 1942.5); (15) Tenant Harassment (L.A. Mun. Code, §§ 45.33, 45.35); (16)

Unfair Competition (Bus. & Prof. Code, § 17200 et seq.)
**DEMAND FOR JURY TRIAL**

Plaintiffs Aaron Guhin and Ron Ruangtragool allege as follows. This Court has subject-matter jurisdiction over the First Claim under 28 U.S.C. sections 1331 and 1337(a) and 15 U.S.C. section 15(a), and supplemental jurisdiction over the remaining claims under 28 U.S.C. section 1367(a).

## INTRODUCTION

1. Northland and Greystar, the owners and property manager of THEA at Metropolis ("THEA"), a 685-unit tower in downtown Los Angeles, ordered Plaintiffs Ron Ruangtragool and Aaron Guhin out of their home, Unit 1625 (the "Unit"), during the heavy rains of March 2023, due to what Greystar told them was a leak "coming from above." Their crews cut open walls and ceilings throughout the apartment and left it uninhabitable. A City building inspector later examined the opened walls and reported "no evidence of any water damage or leaks of any kind, either recent or months ago." Northland and Greystar nevertheless continued charging Plaintiffs the full $6,124 monthly rent.

2. For nearly six months, Northland and Greystar left the apartment unrestored, with its walls and ceilings open, its smoke and carbon monoxide alarms missing or disabled, and demolition debris and dust throughout, despite Plaintiffs' demands and County and City repair

orders. Defendants required Plaintiffs to vacate the unit and promised compensation and rent credits; in reliance, Plaintiffs paid for temporary housing and displacement costs at their own expense. Yet when Plaintiffs reported the uninhabitable conditions and requested repairs, Northland and Greystar entered without authorization, gave false permit excuses, and withdrew repair crews. Defendants then left the remediation unfinished and stonewalled Plaintiffs' inquiries regarding when their home would be safe to reoccupy. After a month of unfulfilled repair promises, Defendants demanded full rent and sent a written notice automatically renewing the lease on the unrepaired unit at $6,730 month-to-month unless Plaintiffs locked into a new long-term lease at the "discounted" rate of $6,124. This bad-faith escalation triggered further retaliation; after police were called, Greystar's general manager threatened Ruangtragool: "we will come after you if you ever call the police again" and "we know where you live." Northland then conditioned the previously promised affected-day credit on a confidential release and withdrawal of Plaintiffs' agency complaints, and withheld that credit. With reconstruction unfinished and the safety violations uncorrected, Plaintiffs were forced to surrender their home on September 19, 2023.

3. In addition, the $6,124 monthly rent Defendants continued to demand, and sought to lock in again or hike to $6,730 at the end of the lease, had been artificially inflated from the inception of the lease. On information and belief, Greystar set that rent for THEA's prior owner and then for Northland through RealPage, Inc.'s ("RealPage") revenue management software, including YieldStar or AI Revenue Management ("AIRM") software, which was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool to coordinate and agree upon rental housing pricing with competing landlords. When Northland acquired THEA, it retained Greystar and continued that pricing arrangement. Having opted out of the class settlements in *In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.) (the "RealPage MDL"), Plaintiffs seek the overcharges in rent they paid, together with relief for the nonrepair, withheld credits, property damage and loss, retaliation, harassment, and forced surrender arising from their tenancy.

**PARTIES**

4. Plaintiffs Ron Ruangtragool and Aaron Guhin were residential tenants of the Unit at THEA, a 59-story, 685-unit residential building at 1000 West 8th Street, Los Angeles, California 90017. They rented the Unit for living purposes and retained their tenancy and right to possession until they surrendered the Unit. Each paid rent to THEA's owner through Greystar.

5. Defendant Northland Investment Corporation ("NIC") is a Massachusetts corporation with its principal place of business at 2150 Washington Street, Newton, Massachusetts 02462. During the events alleged here, NIC performed asset management for THEA's owners. Through its personnel, including Brian Toqe, NIC engaged and supervised Greystar at THEA, including its performance of the owners' repair and maintenance obligations, and participated in repair scheduling, capital work, concessions, and the handling of resident and agency complaints. On information and belief, NIC also directed, approved, or ratified the repair, access, rent-credit, and pricing decisions at THEA, including the continued use of RealPage's revenue-management services and the pricing and data-supply practices there.

6. Defendants Northland Thea Portfolio LLC, Northland Thea LLC, Northland Thea Portfolio II, LLC (f/k/a Northland Thea Ventures LLC), Northland Thea Portfolio III, LLC (f/k/a Northland Thea V LLC), and Northland Thea IV LLC (collectively, the "Owner LLCs") are Delaware limited liability companies headquartered at NIC's Newton address. On information and belief, the Owner LLCs are under the common ownership, management, and control of NIC and act as its agents, and NIC, directly and through the Owner LLCs, acquired THEA. The Owner LLCs hold title to THEA and assumed the lessor's obligations under Plaintiffs' lease. On information and belief, at all times after the acquisition NIC and Gottesdiener controlled and possessed THEA and directed the management of the Owner LLCs' assets, revenues, liabilities, and expenses, including THEA's repair and capital budgets and concessions. NIC and the Owner LLCs are collectively "Northland." After the acquisition, Northland owned and operated THEA and collected the Unit's rent.

7. Defendants Greystar California, Inc. ("Greystar California"), Greystar Real Estate Partners, LLC ("GREP"), and Greystar Management Services, LLC ("GMS") (collectively, "Greystar") are entities within the Greystar corporate family headquartered in Charleston, South Carolina. Greystar California is a Delaware corporation, and GREP and GMS are Delaware

limited liability companies. Throughout Plaintiffs' tenancy, Greystar was THEA's authorized property-management and leasing agent, for the prior owner and then for Northland, and managed THEA, including the Unit, through on-site personnel including general manager Keith Jones and its community manager. Greystar billed and collected the Unit's rent and carried out the repair and access decisions alleged below. On information and belief, Greystar entered into a written contract with RealPage for, paid for, and used RealPage's software, including OneSite and its revenue management software, and its personnel administered that software at THEA on behalf of, and under the budgetary direction and control of, the owners, including Northland.

8. On information and belief, GREP and GMS licensed, administered, or used the RealPage revenue-management services used at THEA and directed, approved, or ratified the pricing protocols and personnel through which those services were applied there. When Plaintiffs refer to Greystar by a single name, they are alleging that one or more employees or agents of entities within the Greystar corporate family engaged in the acts alleged on behalf of every company in that family. The individual participants did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within the Greystar corporate family. The individual participants entered into agreements on behalf of the Greystar corporate family. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

9. Defendant Matthew Gottesdiener is, and during the events alleged here was, NIC's chief executive officer and the chief executive officer of Northland Thea Portfolio II, LLC, Northland Thea Portfolio III, LLC, and Northland Thea IV LLC. On information and belief, Gottesdiener knowingly participated in effecting the combination underlying the Sherman Act and Cartwright Act claims, as one who authorized, ordered, or helped perpetrate it, including by authorizing the continued RealPage pricing arrangement at THEA through NIC's revenue-management operation. On information and belief, he also specifically authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop the conduct underlying each other Claim against him, including the continued nonrepair, withholding of credits, and access practices after he learned of the Unit's conditions and Plaintiffs' demands, and he aided and facilitated the tenant harassment alleged below. He is sued in his individual capacity.

10. Northland, Greystar, and Gottesdiener are collectively "Defendants." On information and belief, Northland, through its subsidiaries, affiliates, and agents, operated as a single unified entity, with the Owner LLCs acting as NIC's agents. The Owner LLCs share NIC's Newton address; anyone authorized to act for the Owner LLCs was an NIC employee or agent; Greystar, contractors, and government agencies dealt with "Northland," the "Northland Capital Team," or NIC as the owner without distinguishing among the entities; and government notices for the Unit went to the owner in care of NIC. The Owner LLCs acted through NIC in asset management and through Greystar in on-site management, leasing, billing, repairs, and access. NIC acted through its officers and asset managers, including Gottesdiener and Toqe. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Each principal is liable for its agents' conduct within the scope of those functions, and each Defendant is liable for the wrongful conduct it committed, authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop. Whenever reference is made to any act of any corporation or limited liability company, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction under 28 U.S.C. sections 1331 and 1337(a). Plaintiffs bring the First Claim under Section 1 of the Sherman Act, 15 U.S.C. section 1, and Section 4 of the Clayton Act, 15 U.S.C. section 15(a). The challenged combination operated through interstate transmission of leasing data and pricing recommendations and substantially affected interstate commerce in residential rental housing.

12. This Court has supplemental jurisdiction over the state-law and municipal claims under 28 U.S.C. section 1367(a) because they and the First Claim derive from a common nucleus of operative fact. Each claim arises from the same lease, the same rent, and the same rent demands and collections for the Unit. The First Claim challenges the $6,124 rent and the renewal terms offered to Plaintiffs as set through the pricing combination; the tenancy claims challenge Defendants' demands for that same rent, and their offer of those same renewal terms, while the

Unit was untenantable and the promised credits were withheld. On information and belief, the same Northland and Greystar operation, through Toqe, Jones, and the personnel they directed, set or approved the rent, concessions, and renewal terms and made the repair, access, and credit decisions, and the same lease, ledger, RealPage account statements, renewal offer, and management correspondence prove both. The RealPage account statements and the Renewal Offer are each operative to both: each demanded or offered the combination-priced rent for the same Unit while the promised credits, which are concessions reducing the Unit's effective rent, were withheld. The rent dollars at issue overlap: each monthly payment challenged as an antitrust overcharge includes rent for the unusable days challenged under the tenancy claims, so the same payments and credits must be decided together. Plaintiffs would ordinarily be expected to try all of the claims in one judicial proceeding.

13. This Court has personal jurisdiction over the Owner LLCs, NIC, and Greystar under Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10. The Owner LLCs owned THEA, real property in Los Angeles, and leased the Unit as lessor; NIC undertook asset management and directed decisions for that California property; Greystar managed and leased THEA's apartments, including the Unit; and, on information and belief, GREP and GMS also supplied, administered, or directed the pricing services used there. On information and belief, GMS operates in the Los Angeles submarket and owns or operates multifamily units there priced with RealPage's revenue-management software.[1] Plaintiffs' claims arise out of and relate to those California activities. This Court also has personal jurisdiction over the incorporated Defendants, NIC and Greystar California, under the Clayton Act, 15 U.S.C. section 22, and Federal Rule of Civil Procedure 4(k)(1)(C), because each transacted substantial business in this District, including through the operation and management of THEA, and throughout the United States, and engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including

[1] Multifamily Pls.' Second Am. Consol. Class Action Compl. ¶¶ 123, 494, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071 (M.D. Tenn. Sept. 7, 2023), ECF No. 530 ("MDL Compl.").

Plaintiffs in this District. This Court has pendent personal jurisdiction over them on the remaining claims, which arise out of a common nucleus of operative fact with the First Claim.

14. On information and belief, Gottesdiener is domiciled in and a citizen of Massachusetts. This Court has personal jurisdiction over Gottesdiener on each Claim against him under Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10, and pendent personal jurisdiction over him on any such Claim that arises out of a common nucleus of operative fact with a Claim for which jurisdiction exists. In litigation between the Owner LLCs and THEA's prior owner in Los Angeles County Superior Court No. 24STCV20007 (the "Greenland litigation"), he declared under penalty of perjury that he and his team at Northland acted on the prior owner's 2023 requests to release funds held in escrow from THEA's sale.[2] On information and belief, as chief executive of NIC and three of the Owner LLCs, he directed or approved the acquisition of THEA, a Los Angeles residential tower; received reports on THEA from Toqe, who oversaw its asset management; authorized and directed keeping THEA's rents on the RealPage system; and authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop the repair, access, rent, and credit decisions at THEA. Those intentional acts were expressly aimed at California, where THEA and the Unit are located, and caused harm that he knew was likely to be suffered in California. The Claims against him arise out of and relate to that conduct.

15. Venue is proper under 28 U.S.C. section 1391(b)(2) and 15 U.S.C. sections 15 and 22. THEA is in this District, a substantial part of the events giving rise to the claims occurred here, and the entity Defendants transacted business concerning THEA here.

---

[2] Purchase and Sale Agreement §§ 5.2, 12.4 ("PSA"), filed as Ex. 5 to Decl. of Gang Hu, Compendium of Evidence in Supp. of Mot. for Summ. J., *Greenland LA Metropolis Dev. III LLC v. Northland Thea LLC*, No. 24STCV20007 (L.A. Cnty. Super. Ct. July 22, 2025); Decl. of Matthew Gottesdiener ¶¶ 16–18, 20, *Greenland*, No. 24STCV20007 (Sept. 10, 2025) ("Gottesdiener Decl.").

## STATEMENT OF FACTS

**A. Northland's retained control and Greystar's management**

16. The Owner LLCs took over Plaintiffs' lease as lessor and assumed the lessor's obligations under it when they acquired THEA. Plaintiffs rented the Unit as cotenants under a written lease made with THEA's prior owner before Northland's acquisition and a later written roommate amendment that added Guhin as a resident and party, and after the initial term the tenancy continued on the same terms. The lease provides that "we," "us," and "our" include "any of owner's successors' in interest or assigns," and "binds subsequent owners." On information and belief, at the closing of Northland's acquisition the prior owner assigned THEA's leases, including Plaintiffs' lease, to the Owner LLCs. The Owner LLCs' counsel wrote to Ruangtragool that the firm "represents your landlord, Northland Thea Portfolio LLC," concerning "[t]he Lease Contract by and between Northland Thea Portfolio LLC, as owner, and Ron Ruangtragool, as resident." In a cross-complaint the five Owner LLCs filed together against the prior owner in the Greenland litigation, they alleged that THEA "is operated as a multifamily apartment building with residential tenants under leases from Northland as landlord," with "Northland" there referring to all five Owner LLCs.[3]

17. The owner agreed to "act with customary diligence to make repairs and reconnections" (lease paragraph 27). It agreed to furnish the smoke and carbon monoxide detectors required by statute (lease paragraph 25). Its right to enter was limited to entry "as allowed by law," and it agreed to "serve Resident with written notice before entry" (lease paragraph 29). Under the lease, "[w]ritten notice to or from our managers constitutes notice to or from us" (lease paragraphs 1 and 36), and notices and requests from any resident "constitute notice from all residents" (lease paragraph 30). The lease also provides for attorney's fees in enforcing its obligations.

---

[3] Northland Defs.' First Am. Cross-Compl. pmbl. & ¶ 13, filed as Ex. 16 to Decl. of Gang Hu, *supra* note 2 ("Northland FACC").

18. Northland retained control over THEA's structure and building systems, including the Unit's walls, ceilings, plumbing, ventilation, and smoke and carbon monoxide alarms, and financial control over rents, credits, concessions, repair and capital budgets, and accounts, through NIC's asset management and Greystar's on-site management. In the Greenland litigation, Northland told the court that "[t]here is no dispute that Northland is responsible for maintaining the THEA Property" and that it "remains the exclusive owner and responsible party for the THEA Property, including any investigation or remediation of alleged defects."[4] Repairs, reconstruction, concessions, and access conditions were subject to Northland's direction and approval. Greystar's community manager wrote that "our ownership group" would "approve rent concessions due to being displaced from your home."

19. Throughout the events alleged here, Brian Toqe, a Los Angeles-based director of Northland, was NIC's Director of Asset Management for THEA and led Northland's West region asset management and engagement of third-party managers. Jones told Plaintiffs that his actions, and those of Northland's other agents at THEA, were under the direct supervision and control of Toqe. Asked about one visit to the Unit, Jones told Ruangtragool that it "was a decision made by my asset manager," that "[h]e verified it," and that "I report to them." On information and belief, Toqe supervised Jones and reported to Gottesdiener. In the Greenland litigation, Gottesdiener declared under penalty of perjury that he is NIC's chief executive officer and that NIC is "an affiliate of" the five Owner LLCs.[5]

20. After Northland acquired THEA, Gottesdiener answered a public post that praised THEA and credited the Northland team. He stated that Northland had a multimillion-dollar value-add budget and many operating initiatives for THEA, as shown in Figure 1.[6] Two months

---

[4] Mem. of P. & A. in Supp. of Northland's Dem. to Master Ass'n's First Am. Cross-Compl. at 14, *Greenland*, No. 24STCV20007 (Mar. 25, 2025); Reply in Supp. of Northland's Dem. to Master Ass'n's First Am. Cross-Compl. at 5, *Greenland*, No. 24STCV20007 (May 21, 2025).

[5] Gottesdiener Decl. ¶ 1.

[6] Matthew Gottesdiener (@MRossG199), X (Jan. 25, 2023), https://x.com/MRossG199/status/1618288921569529856.

later, Greystar, for Northland, ordered Plaintiffs out of the Unit, and, despite that budget, Northland left the Unit unrestored for nearly six months.



Figure 1

21. On information and belief, Gottesdiener, personally and through Toqe and NIC, participated in decisions at THEA regarding repairs and capital expenditures, budgets and rent concessions, access and entry, responses to resident and agency complaints, relocation, and rent pricing, and authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop the conduct alleged against him, including the decisions concerning the Unit alleged below.

22. Northland took part in scheduling and approving the repairs. Greystar wrote that "[o]ur ownership and new vendor will need to take a quick look to compose a schedule to begin repairs," and Jones later identified the visitors as the "Northland Capital Team," Greystar staff, and "the vendor Reliance." Northland's counsel wrote that "our client's vendor will be performing repairs." On information and belief, the Northland Capital Team was NIC or Northland personnel, or both, acting for Northland.

23. The Los Angeles County Department of Public Health, Environmental Health (the "County"), the Los Angeles Department of Building and Safety ("LADBS"), and the Los Angeles Housing Department ("LAHD") sent notices and reports for the Unit to the owner in care of NIC, or to Northland Thea Portfolio LLC, at 2150 Washington Street, Newton, Massachusetts. The purchase agreement directed notices to the purchaser at that address, "c/o Northland Investment Corporation," to the "Attention: Matthew Gottesdiener."[7] On information

[7] PSA § 12.4.

and belief, NIC received and handled the Unit's notices through its asset-management operation, and Toqe learned their contents in supervising THEA.

24. On information and belief, through his executive role, Toqe's reporting, the agency notices sent to NIC's Newton office, and Plaintiffs' September 13, 2023 notice addressed in his care, Gottesdiener learned of the Unit's unrepaired conditions and Plaintiffs' repair demands and agency complaints, and authorized or ratified NIC's and Toqe's continued withholding of repairs and promised credits, the guard postings, and the September 18 and 19 entries that forced Plaintiffs to surrender the Unit.

25. At all relevant times Greystar managed THEA and the Unit as Northland's property-management agent, actual and apparent, acting within the scope of that agency in each act alleged against it. Through Jones and its other on-site staff, Greystar directly controlled on-site remediation and reconstruction, resident-ledger billing and rent demands, and physical access to the Unit. Northland, Greystar, or both hired, directed, admitted, or supervised the contractors and personnel who worked in the Unit, including Restoration Management Company, Reliance Building Services, and Greystar's own maintenance staff, each acting as the agent of Northland, Greystar, or both (together, the "Repair Agents"). Jones, the general manager at THEA, imposed and enforced each condition on repairs, entry, and relocation, at Northland's direction, with its approval, or with its knowledge and acquiescence. The lease identifies Greystar, at 1000 West 8th Street, as the "Owner or Owner's Agent" in the disclosure Civil Code section 1962 requires.

26. On information and belief, Toqe was a managing agent of NIC and the Owner LLCs at THEA, with substantial discretionary authority over West region asset-management policies, third-party manager supervision, and THEA's repair approvals, access, concessions, and response to resident complaints. On information and belief, Jones was Greystar's managing agent at THEA. As general manager of the 685-unit tower, he set the preparation and absence conditions for the Repair Agents' return, decided when work would pause, posted guards at the Unit, and gave residents and the County the schedule of and reasons for the work, exercising substantial discretionary authority over decisions that determined policy at THEA on entries, access and preparation conditions, repair scheduling, guard postings, and communications with residents and agencies.

**B. THEA's RealPage-priced rent**

27. The Property List of Angeion Group, the court-appointed settlement administrator in the RealPage MDL, reports that "THEA AT METROPOLIS appears to be included on the Property List," as shown in Figure 2.[8] The settlements concern rent paid at properties subject to a license for RealPage's Lease Rent Options ("LRO"), YieldStar, or AIRM during a class period spanning Plaintiffs' tenancy. On information and belief, THEA was priced under a RealPage revenue-management license during the periods alleged here.




Figure 2

28. Greystar billed the Unit's rent each month on RealPage account statements, which listed the Unit's "Base Rent" of $6,124.00. Greystar billed that $6,124 base rent from the start of Plaintiffs' lease, first for THEA's prior owner and, after Northland's acquisition, for Northland, and Plaintiffs paid the rent Greystar billed. As the United States alleges in *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C.) (the "Government Case"), a Greystar revenue

---

[8] RealPage Rental Settlement, *Property Lookup*, https://www.realpagerentalsettlement.com/property-lookup (last visited Oct. 19, 2026).

management director wrote that RealPage is "pulling data from anyone using RealPage products."[9]

29. On information and belief, throughout Plaintiffs' tenancy Greystar priced or caused to be priced the rents at THEA, including the Unit's $6,124 rent and the renewal terms offered to Plaintiffs, and after Northland took title it did so alone or with Northland, at the direction of or with the approval or ratification of Northland, including NIC, or Gottesdiener. It did so with RealPage's revenue management software, including YieldStar or AIRM, which one or more Greystar entities or Northland licensed, administered, or operated. On information and belief, as a condition of using that software, Greystar, or Northland through Greystar, regularly supplied or caused to be supplied to RealPage THEA's nonpublic, competitively sensitive lease data, including (a) executed rents and net effective rents after concessions for its units, including the Unit; (b) lease terms, lease expirations, and forward availability and occupancy; (c) renewal offers, including the offer made to Plaintiffs, and renewal acceptances and rejections; and (d) rental applications and prospective-renter traffic.

**C. Ordered displacement and promised restoration**

30. Plaintiffs were paying the Unit's $6,124 rent, billed monthly on RealPage account statements, when, in late March 2023, during that winter's heavy rains, Greystar, for Northland, ordered Plaintiffs by telephone to leave the Unit at once, without their belongings, for its contractors' work, and Plaintiffs left that night. On March 28, 2023, Greystar admitted in writing, "Yes, you were told to vacate," and promised for Northland that "as far as the days you were affected you will be credited" and "you will be taken care of." The affected-day credit promise was not conditioned on a release.

31. Relying on the credit promise and Greystar's representations that the displacement was temporary, Plaintiffs kept their tenancy rather than terminating it. They stayed with their two dogs in nearby temporary housing at their own expense, as Greystar directed, so they could

---

[9] Am. Compl. ¶ 25, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Jan. 7, 2025), ECF No. 47 ("Gov't Am. Compl."), https://www.justice.gov/atr/media/1383471/dl.

attend inspections, provide access, and protect their belongings. Plaintiffs cooperated with the work and did not obstruct repairs. They gave access for the contractor assessments Greystar scheduled and confirmed to Jones in writing that they were not denying access.

32. The Repair Agents cut holes in the walls and ceilings of almost every room, spread demolition dust throughout the Unit and over Plaintiffs' inadequately protected belongings without air scrubbers in place, and left smoke and carbon monoxide alarms missing or disabled. Servpro of Westlake ("Servpro"), a restoration contractor Ruangtragool retained, checked the walls with a moisture reader and thermal imager, and "[t]here was no moisture detected." It reported inconsistent demolition: "All areas had a 2' flood cut but there were some areas such as in the kitchen and living room that had areas that were not even touched. Yet in areas adjacent to the untouched walls, walls had been demoed." It found "no evidence of any leak or flooding that occurred" in the demolished ceiling areas and "no evidence of any major water loss that occurred that would have justified this amount of demo to take place." It concluded, "In its current condition, the unit is uninhabitable, due to the demolition dust still on the tenants contents, no air scrubbers set in place, open walls." THEA's exterior waterproofing at the Unit's balcony and on the roof deck above the Unit was deficient, a building condition Northland was responsible for maintaining.

33. Plaintiffs repeatedly gave Northland, through Greystar, written notice of those conditions and demanded repairs, beginning March 28 and March 31, 2023 and continuing until the surrender. Northland and Greystar knew throughout that period that the Unit was not fit to live in.

34. Northland and Greystar made no repair to the walls and ceilings the Repair Agents had opened until reconstruction began on August 23, 2023. On April 28, 2023, days before May rent came due, Jones told displaced residents, including Plaintiffs, there was "no progress at this time" and directed them to "Pay out of pocket to extend your stays" or "move back into your home with the current state while we work on finalizing completion."

**D. Repair demands brought entry abuses, threats, and financial pressure**

35. While Plaintiffs were tenants in possession of the Unit, the Repair Agents repeatedly entered it without Plaintiffs' consent or other lawful authority, or beyond the permission given.

On March 31, 2023, the Repair Agents entered before the time Greystar's notice had set for an assessment that day. On April 3, Greystar's maintenance staff entered without notice or permission and photographed Plaintiffs' private belongings and living areas, which the work did not require. On April 5, after Plaintiffs had objected in writing, the Repair Agents entered again without notice or permission. Jones admitted in writing that management had entered "without notice." On May 3, Plaintiffs' camera recorded a person entering the Unit without notice or permission; on information and belief, the person was one of the Repair Agents, who held access to the Unit. None of the entries after March 31 was made on the written notice Civil Code section 1954 requires, and at none of them did a fire, flood, leak, or other condition in the Unit require immediate entry.

36. Plaintiffs' belongings stayed in the Unit while Greystar kept Plaintiffs out. The Repair Agents controlled access to the Unit and moved and handled the belongings, and Greystar undertook in writing to protect them. In that custody, electronics, clothing, jewelry, and accessories belonging to each Plaintiff went missing, and demolition dust and debris coated bedding, furnishings, and other contents. Plaintiffs reported the missing belongings to Greystar in writing. Ruangtragool reported his missing belongings to the Los Angeles Police Department on July 21, 2023, and Guhin reported his on August 3, 2023; their LAPD property-loss reports itemize them, including jewelry, watches, computers, phones, cameras, and designer clothing and accessories. None had been returned at surrender.

37. After Servpro's assessment, Jones wrote that Plaintiffs "could be held responsible for further repairs or overages" and that management would "move forward with our legal counsel," and, in a second email, that delays or damage attributed to residents "can result in charge back to the tenants."

38. Plaintiffs took the conditions to the agencies. On April 13 and 18, 2023, Ruangtragool brought Plaintiffs' code complaints about the Unit to LAHD. On May 3, 2023, Plaintiffs filed written code enforcement complaints with LADBS and the County. On May 5, 2023, an LADBS inspector inspected the Unit and met with management about the complaint. Plaintiffs later filed a complaint with LAHD alleging harassment and nonpayment of relocation assistance.

39. Greystar answered the agency complaints with demands for possession. Four days after Plaintiffs' complaints to LADBS and the County, Greystar, as Northland's agent, served Plaintiffs a three-day notice to pay the full $6,124 rent or quit, without applying the promised affected-day credit, which by then covered more than a month of displacement. With nothing repaired, Greystar later served a second three-day notice demanding the full rent or possession. No unlawful detainer followed either notice.

40. One week after Plaintiffs' complaints to LADBS and the County, police were called to the Unit, and Jones told Ruangtragool, "we will come after you if you ever call the police again," and "we know where you live." That evening Jones agreed in writing for Northland, "My team is fully aware that there will not be any entry to #1625 until I review with you and we approve together going forward."

41. Greystar's community manager told Ruangtragool's insurer that Ruangtragool had not paid rent, although Greystar's own ledger showed his payment. Greystar acknowledged payment only after Ruangtragool produced the ledger. The community manager also wrote, "His home is habitable. It follows the habitability guidelines set by the city of LA and was also confirmed by LADBS." LADBS had made no such determination; its inspector wrote that he "did not mention any overall statement of habitability (that specific word I never use)." On information and belief, the community manager knew that. The insurer denied Ruangtragool's displacement claim, citing management's emails, leaving him with unreimbursed displacement expenses.

42. Greystar's concierge wrote that Plaintiffs' renter's insurance "has expired" and asked for proof "as soon as possible to avoid lease violation fees." Guhin's policy remained in effect, and Guhin supplied proof to management that day.

43. Greystar blamed Plaintiffs for the continuing nonrepair. Jones told the County that the tenant had a history of denying access, although Plaintiffs had confirmed in writing that they were not denying access. While police took Ruangtragool's report of missing belongings, Greystar's leasing manager, in Plaintiffs' and the officers' presence, blamed the repair delays on Ruangtragool's complaints to government agencies. At the same encounter, Greystar's community manager misstated to the officers what the housing agencies had said about the Unit. On information and belief, Greystar knew the agencies had not approved the continuing open walls and missing alarms.

**E. Nonrepair despite repeated County and City directions**

44. Northland acknowledged its repair obligation. Northland's counsel wrote to Ruangtragool, "When a condition affecting habitability arises, the landlord's obligation is to make any necessary repairs." Northland nevertheless left the Unit unrestored through the surrender.

45. For nearly six months, Northland failed to repair the Unit through a County notice to abate, a failed inspection, repeated failed re-inspections, a compliance review, and a warning of a City Attorney referral. On May 22, 2023, the County issued a Courtesy Notice to Abate addressed to Northland Thea Portfolio LLC and Northland Thea LLC in care of NIC, stating, "Walls / Ceilings / Floors shall be maintained in good repair or condition," with compliance due June 12, 2023. On June 23, 2023, the Unit failed a County inspection: a County Environmental Health Specialist reported "[o]bserved holes in the walls and ceiling throughout Unit# 1625," cited "deteriorated wall covering in the hallway, adjacent to Unit# 1625," and directed the owner, under Los Angeles County Code sections 11.20.140, 11.20.160, and 11.20.170, to "Repair/ replace all damaged, cracked, or deteriorated walls/ceilings" before re-inspection on or after July 14, 2023. On July 17, 2023, the County told Jones that repairs to the Unit must be expedited. On July 18, 2023, the County re-inspected the Unit, found the violations "outstanding," and required correction before re-inspection on or after August 1, 2023. On August 4, 2023, the County re-inspected the Unit, again found the violations "outstanding," and scheduled a compliance review for August 8, 2023. On August 16, 2023, the County warned Jones that "if repairs have not started by compliance date stated in compliance review, a City Attorney's referral will be made."[10]

46. Greystar had opened the walls without a permit. On June 6, 2023, an LADBS inspector reminded Jones that permits were required to repair the drywall. On June 30, 2023, the inspector

[10] L.A. Cnty. Dep't of Pub. Health, Envtl. Health, Courtesy Notice to Abate, Compl. No. CO0369896 (May 22, 2023); Official Inspection Report, Record ID CO0375155 (June 23, 2023); Re-inspection Reports, Record ID CO0375155 (July 18 & Aug. 4, 2023); Complaint Log, Record ID CO0375155 (entries of July 17 & Aug. 16, 2023).

examined the opened walls and ceilings and wrote, "I saw no evidence of any water damage or leaks of any kind, either recent or months ago," and "ALL surfaces were dry." That day, LADBS issued a Notice of Code Violation for Unit 1625, citing unpermitted drywall work under Los Angeles Municipal Code sections 91.106.1.1, 91.103.1, and 12.21A.1(a), missing or disabled carbon monoxide alarms under sections 91.5R315.1.1, 91.5R315.1.2, 91.5R315.2, 91.5R315.3, 91.5R103.1, and 12.21A.1(a), and missing or disabled smoke alarms under sections 91.5R314.1, 91.5R314.3, 91.5R314.6, 91.5R103.1, and 12.21A.1(a), with compliance due July 30, 2023. Northland and Greystar did not obtain a drywall permit until July 26, 2023. On July 31, 2023, LADBS issued and, on information and belief, served by mail on Northland Thea Portfolio LLC an Order to Comply under sections 91.8104, 91.103.1, 91.5R103.1, and 12.21A.1(a) to "Repair all walls and ceilings that have been damaged by the leak investigation," a violation it located "[t]hroughout the building," and to "Replace or repair" the Unit's missing or disabled smoke and carbon monoxide alarms by August 18, 2023. It stated, "IT IS YOUR RESPONSIBILITY TO CORRECT THE VIOLATION(S)."[11]

47. Northland and Greystar let every County and LADBS deadline pass without restoring the walls and ceilings or replacing the alarms, and had not corrected the violations when Plaintiffs surrendered the Unit. The conditions the County and LADBS cited kept the Unit uninhabitable until the surrender.

**F. Full rent demands and withheld credits**

48. Each month of the displacement, Greystar, for Northland, transmitted a RealPage account statement charging and demanding the full $6,124 monthly base rent and related charges without the promised affected-day or daily relocation credit. Plaintiffs paid rent while bearing hotel and other temporary-housing costs and never resumed living in the Unit. Those statements included the July 29, 2023 and August 24, 2023 statements, the latter sent three days

---

[11] L.A. Dep't of Bldg. & Safety, Notice of Code Violation, Case No. 989814 (June 30, 2023); Bldg. Permit No. 23016-40000-24863 (issued July 26, 2023); Order to Comply, Case No. 991363 (July 31, 2023).

after LAHD's harassment notice. Greystar's September 15, 2023 rent account again charged the full base rent and showed neither promised credit.

49. On April 28, 2023, the same day Jones told displaced residents there was "no progress at this time," Northland, through Greystar, issued Plaintiffs a written Lease Renewal Offer for the Unit (the "Renewal Offer"). The Renewal Offer stated a "current rent on your apartment" of $6,124.00. Its offers for terms of 13 to 18 months were priced at $6,124 for the unrepaired Unit, with no renewal concession. It stated that without a renewal "your lease will automatically renew at the month-to-month rate," $6,730, 9.9 percent more.

50. The concession practices listed for THEA in Northland's purchase agreement gave a "Renewal Concession" of "1 month free" for renewals of "13-18 months," the terms of the Renewal Offer. The same agreement barred the seller from changing its "current leasing practices without the prior written approval of Purchaser" before closing, and it required "the prior written consent of Purchaser" for any free-rent concession "inconsistent with the current practices at the Property."[12] On information and belief, the $6,124 renewal rents, the $6,730 month-to-month rent, and the terms offered were generated by RealPage's revenue-management software, which managed THEA's lease expirations, and Greystar, Northland, or both adopted, approved, or accepted them as generated without reducing the offered rent for the Unit's unusable condition.

51. Northland offered the credit for the days Plaintiffs had already been displaced only in exchange for a release of their claims. The day after the County emailed its report that the violations remained outstanding, Northland's counsel offered Ruangtragool a one-time credit against rent only "subject to you signing the enclosed release of claims." The enclosed Release of Claims (the "Release") required the resident to release the Owner and its "property management companies," "affiliates," and "parent and subsidiary organizations" from "any and all claims," "including, without limitation, any habitability claims"; to "immediately withdraw and dismiss, with prejudice, any complaint, claim, action, suit, or other proceeding" against them; and to keep its substance and contents in "strict confidence." In a later letter, counsel

[12] PSA § 5.4(d) & Ex. T.

wrote that "our client did not force you to vacate in March 2023." Plaintiffs did not sign the Release.

52. In its August 3, 2023 letter, Northland also promised that it "will provide you a daily rent credit for each day you are required to temporarily relocate." The promise was not conditioned on a release, and Northland never applied the credit. Relying on it, Plaintiffs kept their tenancy, stayed away from the Unit for the reconstruction as Northland and Greystar required, and kept paying for their own temporary housing.

**G. Failed reconstruction and interference with access**

53. By a Notice to Enter Dwelling Unit (the "Notice to Enter"), Northland's counsel, signing as "Attorneys for the owner" for all five Owner LLCs, stated that the owner and its agents would enter the Unit from August 14 through September 1, 2023. Counsel wrote the same day that the work would take approximately three weeks and that "you will need to temporarily vacate the apartment while the work is being performed."

54. Northland and Greystar did not start work when the Notice to Enter period began and blamed a late City permit in a report to the County, and Jones wrote to Ruangtragool, "Please note, these delays were caused by waiting on city permits." The LADBS inspector wrote, "I do not know what delay they are referring to. The permit for the drywall repair was issued on 7-26." Plaintiffs sent Jones that correction. Jones nevertheless repeated the excuse in an email copying the County's inspectors: "Repairs were delayed due to pending permits by the City of LA so they could not start work 8/14/2023."

55. Jones also warned Plaintiffs that "The County and City inspectors have mentioned any lack of preparation for the repairmen or refusal of entry will close out any city violation tickets you have opened." The LADBS inspector wrote to Ruangtragool the same day, "We are not involved in that process, nor would such a claim free the owner from the requirement to complete the work."

56. On August 21, 2023, LAHD wrote to "THEA AT METROPOLIS Attn:Keith Jones" and to Northland Thea Portfolio LLC that it "has received a complaint alleging harassment," listing among the acts prohibited if done to harass a tenant "Refusing to do required repairs," "Entering

the apartment without proper notice," "Threatening a tenant with physical harm," and "Using lies or intimidation intended to make a tenant move out."[13]

57. Northland and Greystar increased the preparation demands from three feet away from walls, to the middle of each room, to "a clean line up to 6ft," although the contractor's supervisor said three feet was sufficient. Guhin undertook the additional preparation. Northland and Greystar reported to the County that Plaintiffs were denying access. Plaintiffs prepared the Unit and walked it with the supervisor. Jones confirmed in writing that Ruangtragool admitted the workers when reconstruction began. Plaintiffs had not denied access.

58. On August 11, 2023, Northland's counsel promised in writing that "the vendor will cover all personal belongings with a protective plastic covering prior to commencing the work." Relying on that promise, Plaintiffs left their contents in the vendor's care. While dusty work continued, the Repair Agents removed the coverings, and new dust and debris damaged Plaintiffs' belongings. Plaintiffs discovered the damage within days and reported it to Toqe and Jones. On information and belief, NIC supervised the property-protection work through Toqe and failed to maintain the promised protection.

59. Plaintiffs jointly kept household cameras that monitored the kitchen, Ruangtragool's bedroom, and their belongings. During the reconstruction, Jones assured Plaintiffs that their belongings were safe because "you also have cameras inside your home." Without permission, the Repair Agents covered the kitchen camera and, separately, the bedroom camera, leaving Plaintiffs unable to watch those areas or their belongings until Guhin uncovered them the next day.

60. In September, guards Greystar posted at the Unit repeatedly stayed outside the Unit after the workers left and kept Plaintiffs from retrieving things they needed for daily living and work. Plaintiffs objected in writing to Jones, and Jones acknowledged in writing that guards had remained after the workers left. Plaintiffs also objected in writing to Toqe. On information and

---

[13] Letter from L.A. Hous. Dep't to Keith Jones & Northland Thea Portfolio LLC, Case No. CE284344 (Aug. 21, 2023).

belief, Toqe directed or approved the continued postings as part of NIC's supervision of the repair and access operation.

61. Northland did not finish the work within its own Notice to Enter period. Following the County's compliance hearing, the reconstruction that began on August 23, 2023 was to be completed within three weeks, by September 13, 2023. At Plaintiffs' inspection that day, the wall and ceiling repairs were unfinished, the cited code violations remained uncorrected, and the smoke and carbon monoxide alarms remained missing or disabled.

**H. Forced surrender and resulting injuries**

62. On September 13, 2023, Plaintiffs mailed a letter to NIC at 2150 Washington Street, Newton, Massachusetts, addressed in care of Gottesdiener, NIC's general counsel, and Toqe. The letter gave written notice under Civil Code section 1942, subdivision (a), that Plaintiffs would vacate on September 19 because the conditions remained uncorrected, including the missing or disabled smoke and carbon monoxide alarms and the violations the County and LADBS had cited, and that the promised credits had not been given. Plaintiffs also emailed the letter to Toqe and Jones, and Jones replied, copying Toqe, "Your email has been received." On information and belief, the mailed letter reached NIC's office before September 18, 2023.

63. On September 18, 2023, after the Notice to Enter period had ended, the Repair Agents entered the Unit without Plaintiffs' consent and without the joint approval Jones had agreed to in writing, and that evening Plaintiffs objected in writing to Toqe. The next morning, September 19, the Repair Agents entered again, with a guard at the door, and worked in the Unit without Plaintiffs' consent. With the repairs unfinished and the cited violations uncorrected, Plaintiffs could not safely resume living in the Unit and were compelled to obtain other housing. That afternoon, Plaintiffs returned the keys under protest and surrendered the Unit. NIC, through Toqe, continued supervising the repair, access, and credit response after receiving Plaintiffs' notice and objection.

64. Plaintiffs were discharged from further payment of rent and performance of the lease's other conditions as of the surrender. Northland, through Greystar, nevertheless charged the full $6,124 September rent in the August 24, 2023 statement and September 15, 2023 account, without either promised credit, including rent allocable to the days after the surrender.

65. Each Plaintiff lost residential use of the Unit and ultimately the tenancy. Each Plaintiff's losses caused by Defendants' conduct include, but are not limited to, rent paid for unusable days, diminished leasehold value, substitute-housing and relocation expenses, inspection and mitigation costs, moving and replacement-housing costs, and missing or damaged belongings. The rent paid for those unusable days was the $6,124 monthly rent billed on the RealPage account statements. Injury to their possession, home, and belongings also caused inconvenience, discomfort, annoyance, distress, and fear for their safety, all in amounts according to proof.

66. Northland's and Greystar's conduct toward Plaintiffs was one continuing course from late March 2023 until Plaintiffs surrendered the Unit. The acts in that course were of the same kind and recurred throughout those months: the Repair Agents entered the Unit without consent, Jones threatened Plaintiffs, Northland and Greystar left the conditions unabated and withheld the repairs and the promised credits, and Greystar demanded rent while the Unit remained unrestored. Their successive repair commitments induced Plaintiffs to maintain the tenancy, most recently the September 13, 2023 completion deadline. Distinct acts within that course, including the Renewal Offer, each rent demand and collection, Jones's statements, the property damage, and the September entries, were also each independently wrongful and inflicted distinct injuries.

67. Northland and Greystar knew that the opened walls and ceilings, missing or disabled alarms, and demolition debris and dust prevented Plaintiffs' safe return, and knew of their obligation to correct those conditions and the dangers to health, safety, and property that continuing them created. They kept the conditions uncorrected after repair demands and agency orders, demanded full rent while withholding promised credits, and imposed the threats, false permit excuses, and unauthorized entries alleged here. That knowing course was despicable, subjected Plaintiffs to prolonged displacement and cruel and unjust hardship in conscious disregard of their rights and safety, and was malicious and oppressive within Civil Code section 3294.

68. Jones, Greystar's general manager and managing agent at THEA, personally made the threats, imposed the access and work conditions, and kept the conditions uncorrected after the County directed that repairs be expedited. Toqe, the managing agent of NIC and the Owner LLCs for THEA, exercised the asset-management authority described above, knew of the

conditions from the agency notices and his supervision of Jones, received Plaintiffs' written notice and entry objection, and, on information and belief, authorized or ratified the continued withholding of repairs and credits and the September 18 and 19 entries. On information and belief, Gottesdiener, as chief executive officer of NIC and three of the Owner LLCs, after learning of the conditions, authorized or ratified that continued nonrepair, credit withholding, and late-tenancy access response. Those decisions were made in the exercise of the officers' and managing agents' authority for the respective entities, which thereby authorized and ratified the malicious and oppressive conduct within Civil Code section 3294, subdivisions (a) through (c).

**I. Northland's revenue-management operation**

69. Northland bought THEA after ProPublica had reported on RealPage's YieldStar software and after renters had begun filing Sherman Act class actions against RealPage and the landlords using its software. Gottesdiener was one of the two "Designated Purchaser Employees" whose knowledge was the purchaser's.[14] Northland kept Greystar as THEA's manager. On information and belief, after closing Northland, including through NIC, received THEA's rent, occupancy, concession, and renewal data from Greystar and used it to direct, review, approve, or ratify the rents, concessions, and renewal terms set at THEA through RealPage.

70. On information and belief, NIC staffs revenue management for Northland's properties, and NIC's personnel, including its asset managers under Toqe, performed, directed, or oversaw that function for THEA, alone or with Greystar, and approved the rents set at THEA through RealPage.

71. Months before Northland bought THEA, Gottesdiener, one of the two persons whose knowledge would be the purchaser's in that purchase, publicly described Northland's payments to RealPage for pricing. RealPage's then head of economics wrote that nearly everything he

---

[14] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, ProPublica (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent; *see, e.g.*, Compl., *Bason v. RealPage, Inc.*, No. 3:22-cv-01611 (S.D. Cal. Oct. 18, 2022), ECF No. 1; Compl., *Navarro v. RealPage, Inc.*, No. 2:22-cv-01552 (W.D. Wash. Nov. 2, 2022), ECF No. 1; PSA § 5.2.

posted came from RealPage Market Analytics. Gottesdiener replied that RealPage might provide it to Northland as thanks for the small nation's GDP Northland paid for daily pricing, as shown in Figure 3.[15] On information and belief, the daily pricing Gottesdiener referred to was RealPage's revenue-management service, which Northland continued to use, alone or through Greystar, at THEA after the acquisition. That pricing reached the Unit directly: Greystar billed the Unit's $6,124 rent each month on RealPage account statements.



Figure 3

72. Months before Northland bought THEA, Gottesdiener also publicly advised that, in managing rental property, an owner should pay for RealPage's LRO and YieldStar software and not intervene, and he described the product as essential and absolutely necessary, as shown in Figure 4.[16] On information and belief, Northland, through NIC and Greystar, followed that practice at THEA, and Gottesdiener authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop its use there. At THEA, the Renewal Offer for the Unit omitted the "1 month free" renewal concession that THEA's own concession practices listed for

[15] Jay Parsons (@jayparsons), X (June 21, 2022), https://x.com/jayparsons/status/1539434629333192706; Matthew Gottesdiener (@MRossG199), X (June 21, 2022), https://x.com/MRossG199/status/1539434926545707008; Jay Parsons (@jayparsons), X (June 21, 2022), https://x.com/jayparsons/status/1539438603750744066.

[16] Matthew Gottesdiener (@MRossG199), X (May 20, 2022), https://x.com/MRossG199/status/1527670984072908800.

those terms, and, on information and belief, Northland let the software's terms stand without intervening. Consistent with that advice, Northland's purchase agreement barred THEA's seller, before closing, from changing THEA's current leasing practices without Northland's written approval.



Figure 4

73. Weeks before Northland bought THEA, Gottesdiener publicly identified Northland's pricing software as RealPage's LRO and YieldStar, the same software as others in Northland's field used. He also stated that Northland does not set its rents, which he described as an algorithm's output, as shown in Figure 5. The Wall Street Journal later reported: "'We don't set our rents,' Matthew Gottesdiener, chief executive of apartment owner Northland, wrote in a social-media post last year, adding that he relies on an algorithm."[17] On information and belief, Northland, through NIC and Greystar, adopted the software's output for the Unit, including the $6,124 rent and the Renewal Offer terms without THEA's established renewal concession, rather than adjusting it.



Figure 5

---

[17] Matthew Gottesdiener (@MRossG199), X (Sept. 25, 2022) (since deleted), https://x.com/MRossG199/status/1574229203779731457; Matthew Gottesdiener (@MRossG199), X (Sept. 25, 2022), https://x.com/MRossG199/status/1574202363929411584; Will Parker, *Thanks to Big Data, Landlords Know How to Squeeze the Most Out of Renters*, Wall St. J. (Oct. 24, 2023), https://www.wsj.com/real-estate/commercial/thanks-to-big-data-landlords-know-how-to-squeeze-the-most-out-of-renters-eb7e5f02.

**J. The reciprocal pricing combination**

74. The United States and the States, including California, allege in the Government Case that RealPage and the landlords using its software combined to pool their confidential lease information and align multifamily rents in markets across the United States. Plaintiffs' allegations below about RealPage's software, its users, and Greystar's revenue-management practices are made on information and belief, based on the facts alleged in Parts B and I and the allegations in the Government Case and the RealPage MDL. The United States amended its complaint to name GREP, which it alleges owns or manages multifamily rental units "[t]hrough its subsidiaries, including Greystar Management Services, LLC." AIRM and YieldStar collect from competing landlords data such as rental applications, executed new leases, renewal offers and acceptances, and forward-looking occupancy, and use it to generate price recommendations for the competing landlords. Each participating landlord contributed its own nonpublic data for use in pricing its competitors' units, expecting in return that its competitors' data would price its own. In that combination, RealPage served as the hub. The participating multifamily landlords and property managers served as spokes, connected to one another by a conscious commitment to share their private data and align their pricing. They include Greystar; on information and belief, they include Northland. Months before Northland bought THEA, Gottesdiener publicly wrote that a competing owner had taken rents to market the day it closed using the exact same pricing software that he and his competitors all use, as shown in Figure 6. The renter class plaintiffs in the RealPage MDL allege the same combination.[18]



Figure 6

---

[18] Matthew Gottesdiener (@MRossG199), X (July 21, 2022), https://x.com/MRossG199/status/1550256758676983810; Compl., *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024), ECF No. 1 ("Gov't Compl."); Gov't Am. Compl. ¶¶ 5, 13, 15–16, 246, 248, 260; MDL Compl. ¶¶ 1, 5–6.

75. RealPage's software priced each landlord's units with its competitors' nonpublic data. A Greystar revenue management director testified that she understood that Greystar and other competing landlords that used AIRM or YieldStar agreed with RealPage to share their data, which was combined in a single data pool for use by that software. RealPage used competitors' nonpublic transaction data to price each start date and lease term, to adjust term pricing for competitors' future supply, and to manage lease expirations, a feature that "only increases unit-level prices" and "never reduces the price." On information and belief, RealPage pooled THEA's data with the same types of nonpublic data from competing Downtown Los Angeles ("DTLA") landlords and property managers. It used that pool to generate daily rents for new leases and renewals at THEA and at its competitors. THEA's own data therefore helped price competing units, and competitors' data priced the Unit. Greystar also used LRO, which Gottesdiener named as Northland's software, knowing that YieldStar, LRO, and AIRM each required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors, and a competing landlord's revenue-management executive described LRO as helping competitors "work together" on pricing.[19]

76. RealPage told prospective clients that its use of competitors' granular, transactional data enables landlords to outperform their properties' competitors by 2 to 7 percent, and materials Greystar sent its clients included a flyer explaining that AIRM will "outperform the market 2-7% year over year."[20] On information and belief, Greystar required or encouraged acceptance of the software's rents at THEA and barred or discouraged on-site personnel from negotiating rents below them.

77. RealPage's software priced renewals as well as new leases. When it calculated that a price decrease was warranted, its "governor" recommended the recent average price instead. RealPage's "best practices" guidance told landlords: "Eliminate concessions." In one YieldStar training, Greystar explained that "Concessions are gone!" At a YieldStar user group meeting,

---

[19] Gov't Am. Compl. ¶¶ 19, 53–56, 157–159; MDL Compl. ¶¶ 9, 124.

[20] Gov't Am. Compl. ¶¶ 20, 170.

competing landlords reported few or no concessions, and one reported that renters asking "for a free month on renewals" were "being denied."[21]

78. Greystar's revenue managers also exchanged competitively sensitive information directly with competing landlords. Asked by a competitor what increases on renewal pricing Greystar had seen, Greystar's director of revenue management replied with that information and with how Greystar planned to approach pricing in the upcoming quarter.[22]

**K. Relevant markets and effects on the Unit's rent**

79. THEA competes for downtown renters with other professionally managed conventional apartment towers in DTLA, including Circa LA and Be DTLA. On information and belief, Greystar managed both towers during Plaintiffs' tenancy, and both competed with THEA for the same renters and were priced with RealPage's software.

80. The relevant product market is conventional multifamily residential rental housing: units in buildings of five or more rental units offered to the general public. Student and income-restricted housing serve restricted populations. Buying a home requires capital, financing, and a materially different commitment. Scattered single-family and individually owned condominium rentals do not offer the same combination of building-wide services, on-site management, and rental availability and do not sufficiently constrain conventional multifamily rents in the markets alleged here.

81. The primary relevant geographic market is the DTLA submarket that RealPage itself defines and sells into, in which the penetration rate of YieldStar and AIRM is 30 percent or more and the landlords using AIRM or YieldStar collectively have market power.[23] Renters seeking a professionally managed apartment near downtown employment, transit, and entertainment do not treat apartments elsewhere in the metropolitan area as reasonable substitutes in response to a small but significant and non-transitory increase in rent. Landlords

---

[21] Gov't Am. Compl. ¶¶ 62, 108–109, 151, 154, 156, 178.

[22] *Id.* ¶ 90.

[23] *Id.* ¶¶ 208–209 & App. A.

monitor nearby professionally managed buildings. Housing is a necessity, demand is relatively inelastic, moving is costly, leases bind renters for fixed terms, new supply cannot respond quickly, and apartment rents are not ordinarily negotiated. On information and belief, the participants' use of YieldStar and AIRM during Plaintiffs' tenancy gave the combination sufficient power to raise or stabilize rents and suppress concessions in DTLA.

82. Alternatively, the relevant geographic market is the Los Angeles-Long Beach-Anaheim metropolitan area. Landlords using RealPage's revenue-management software accounted for more than 52 percent of that multifamily rental market.[24] On information and belief, the participating landlords' combined holdings and reciprocal use of confidential transaction information gave the arrangement power to reduce rent and concession competition there during Plaintiffs' tenancy.

83. The rent roll attached to Northland's purchase agreement recorded 65 vacant units out of THEA's 685 units, yet, on information and belief, Northland and Greystar held THEA's rents upon taking over the property rather than reducing them to fill those units, consistent with Gottesdiener's public description, months before the purchase, of a competing owner for taking rents to market the day it closed.[25] On information and belief, without assurance that competing DTLA landlords using RealPage would refrain from undercutting them, maintaining elevated base rents despite substantial vacancies at acquisition and eliminating established renewal concessions for existing tenants would have been contrary to Greystar's and THEA's owners' unilateral economic self-interest.

84. RealPage's license and data terms for THEA, the rents its software recommended for the Unit, the settings applied, and Defendants' internal pricing and approval records are in RealPage's and Defendants' possession. Plaintiffs allege the facts about them on information and belief. Those allegations rest on the facts alleged in Parts B and I through K and on the facts the United States and the States allege in the Government Case and the renter class plaintiffs allege in the RealPage MDL.

---

[24] MDL Compl. ¶¶ 491, 493.

[25] PSA § 5.1(h) & Ex. Q.

**L. Agency proceedings, class-action exclusion, and timeliness**

85. Plaintiffs pursued administrative enforcement concerning the Unit through LAHD, LADBS, and the County beginning April 13, 2023. The proceedings sought abatement and relief for the same uninhabitable conditions, withheld repairs, unauthorized entries, and harassment alleged here. The County and LADBS inspected the Unit, issued violation notices and orders to comply, and set compliance deadlines. During that proceeding, at LAHD's request, Plaintiffs submitted their lease, management correspondence, photographs, renewal offer, and agency notices. Defendants had timely notice of those proceedings and of the facts underlying these claims: the agency notices reached Northland at NIC's Newton office, Plaintiffs' September 13 notice was addressed there in Gottesdiener's care, and Greystar's managers met LADBS's inspector about the Unit, received the County's reports, answered the County's inspectors, and received LAHD's harassment notice. No Defendant is prejudiced in gathering evidence or defending these claims, which rest on the same records the agencies compiled. Plaintiffs pursued those remedies reasonably and in good faith while they remained tenants and cooperated with the work. The limitations periods on the Third through Fifteenth Claims were equitably tolled while those proceedings remained pending.

86. The RealPage MDL renter class plaintiffs' consolidated complaint names GMS as a defendant. It sought to represent all persons who paid rent on a multifamily lease from a defendant owner or manager participating in RealPage's revenue management solutions, "or from a division, subsidiary, predecessor, agent, or affiliate" of one, during a class period spanning Plaintiffs' tenancy. Plaintiffs, who paid their rent to Greystar, were members of those putative classes and of the settlement classes. Plaintiffs requested exclusion from the RealPage MDL settlements. The court's October 15, 2026 Final Approval Order and Judgment granted their requests and lists them among the persons excluded from the settlement classes. Those persons are not bound by that judgment.[26] A copy of the Final Approval Order and Judgment, including its list of exclusions identifying Plaintiffs, is attached as Exhibit A.

---

[26] MDL Compl. ¶¶ 123, 681; Final Approval Order and Judgment, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071 (M.D. Tenn. Oct. 15, 2026), ECF No. 1619.

87. Each monthly rent demand and collection at a price set through the combination, including each rent payment Greystar collected for the Unit, was an overt act that inflicted new injury on Plaintiffs and started a new four-year limitations period under 15 U.S.C. section 15b and Business and Professions Code sections 16750.1 and 17208. In addition, the Government Case was instituted on August 23, 2024 to prevent and restrain the RealPage pricing arrangement alleged here and remains pending;[27] Plaintiffs' federal antitrust claim is based in part on those same matters, including Greystar's participation, and the running of the limitations period has been suspended under 15 U.S.C. section 16(i). The limitations period was also tolled for Plaintiffs' individual claims from the filing of the putative class actions consolidated in the RealPage MDL until Plaintiffs' exclusion.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Agreement in Restraint of Trade, Sherman Act Section 1, 15 U.S.C. Sections 1 and 15

(Against All Defendants)

88. Plaintiffs incorporate paragraphs 4 to 11, 16 to 29, 48 to 50, 69 to 84, 86, and 87.

89. Beginning at a time currently unknown to Plaintiffs, before the rent payments at issue, and continuing through at least September 2023, RealPage and the owners and managers of competing Los Angeles apartments priced with its software, including Northland and Greystar, entered into and engaged in a contract, combination, and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. section 1. The conspiracy consisted of an agreement to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units, and it involved the exchange of competitively sensitive information between and among them. RealPage invited competing landlords to give it their current nonpublic lease data and to price their units with rents its software generated from the pooled data of all of them, representing that the software's use of competitors' data would let

[27] Gov't Compl.; Gov't Am. Compl.

each landlord outperform its competitors. Each participant accepted that invitation. It agreed with RealPage to supply the nonpublic lease data the software required, to price its units with rents generated from the pooled data, and to delegate rent setting to the software, knowing that RealPage required the same data from its competitors and used each participant's data to set the others' rents. Each participant understood that the rents it received from the software were generated from the nonpublic data that it and its competitors were all supplying to RealPage, and that its competitors understood the same. Each priced its units with those rents knowing that its competitors would not lower their rents to take its renters. The participants thereby agreed with one another, through RealPage, to price with the software's rents, and deprived the market of fully independent centers of decision-making on pricing.

90. Contributing current nonpublic rents, concessions, occupancy, and lease terms for use by RealPage to recommend prices for competitors' units is contrary to a landlord's independent economic self-interest unless the landlord knows it is receiving in return the benefit of its competitors' data in pricing its own units. The agreement is further shown by facts including (a) the participants' shift from filling units to holding rents with units empty, including at THEA; (b) the participants' adherence to the software's rents, including Northland's chief executive's statements that Northland does not set its rents and that owners should not intervene; (c) RealPage's invitation to outperform competitors by using their data, which Greystar passed on to its clients, and the user group meetings at which competing landlords compared concessions; (d) Greystar's direct exchanges of pricing and concession information with competitors; (e) the public statements of Northland's chief executive that Northland paid RealPage for daily pricing and used the same pricing software as others in its field; (f) a market of inelastic demand, costly moves, and fixed-term leases, in which renters cannot readily turn to landlords outside the agreement; and (g) on information and belief, Greystar's management of THEA and of its competing DTLA towers Circa LA and Be DTLA, each priced with RealPage's software.

91. Independently and in the alternative, the agreement to exchange current, nonpublic lease information for reciprocal use in pricing competing properties unreasonably restrained trade. The participants' common pricing pool reduced uncertainty about competitors' transactions and availability and restrained independent competition over rents and concessions in the markets alleged here. That information-sharing agreement is unlawful under the rule of reason.

92. Greystar joined and participated in the conspiracy throughout Plaintiffs' tenancy, first for THEA's prior owner and then for Northland. On information and belief, Greystar agreed with RealPage, directly or through the Greystar corporate family's license, to supply THEA's lease data to the pool and to price THEA, including the Unit, with the software. On information and belief, one or more of Greystar California, GREP, and GMS held, administered, or used the license under which THEA was priced; set, authorized, or approved the pricing policy applied at THEA; and employed, directed, or supervised the personnel who priced THEA and supplied its data. GREP, through its subsidiaries, including GMS, owns or manages multifamily rental units across the United States, and GMS entered into a written contract for, paid for, and used YieldStar, LRO, and AIRM to manage some or all of Greystar's units and owns or operates units in the Los Angeles submarket priced with that software.[28] Each Greystar entity joined by doing one or more of those acts, or by authorizing, directing, or ratifying another's doing them. By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Greystar agreed to join a cartel with those horizontal competitors. Greystar would not have paid for RealPage's revenue management software unless (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using that software to set their rental prices in the submarkets in which it operated. Each Greystar entity knew the exchange was reciprocal.

93. Northland joined the conspiracy no later than when it took title to THEA and remained in it at least through the surrender. It took over a tower Greystar was already pricing through RealPage's software. Before closing, its purchase agreement barred the seller from changing THEA's current leasing practices, or granting any free-rent concession inconsistent with them, without Northland's prior written approval. It kept Greystar as manager, assumed Plaintiffs' lease, and kept and collected the Unit's $6,124 rent, and, on information and belief, it kept THEA's RealPage license and data supply and the rents the software generated. Through Greystar, it issued the Renewal Offer, which on information and belief the software generated. It did so knowingly: on information and belief, NIC staffs revenue management for Northland's

---

[28] Gov't Am. Compl. ¶ 248; MDL Compl. ¶¶ 123–124, 494.

properties. On information and belief, Northland, through NIC's asset managers under Toqe, through Greystar, or both, received THEA's rent, occupancy, concession, and renewal data, held the approval of rent concessions at THEA, and directed, authorized, approved, or ratified the continued pricing of THEA with RealPage's software and the rents and renewal terms it generated, knowing the exchange was reciprocal. Northland would not have paid for RealPage's revenue management software, at a cost Gottesdiener likened to a small nation's GDP, or kept THEA on it, unless (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using that software to set their rental prices in the submarkets in which it operated. On information and belief, whether THEA's units were priced with RealPage's software was Northland's decision as owner, and Greystar priced them as Northland's agent. The Owner LLCs authorized and accepted that conduct by their asset and property managers. Northland is liable for Greystar's acts as its agent in setting and collecting THEA's rents.

94. Gottesdiener knowingly participated in the conspiracy. As chief executive officer of NIC and of three of the Owner LLCs, he had authority over Northland's pricing policy. He was one of the two persons whose knowledge was the purchaser's in the THEA purchase, which closed after RealPage's pooling of competitors' data had been publicly challenged. In the months before the purchase, he publicly identified RealPage's LRO and YieldStar software as Northland's pricing software and the same as others in its field used, advised that landlords pay for that software and not intervene, and stated that Northland does not set its rents because they are the algorithm's output. After the purchase, he publicly touted a multimillion-dollar value-add budget for THEA. On information and belief, he authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop Northland's policy of pricing its units, including THEA's, through RealPage, and approved keeping THEA on RealPage after the purchase, knowing that the software pooled competitors' nonpublic data and that the exchange was reciprocal. He knowingly participated in effecting the conspiracy as one who authorized, ordered, or helped perpetrate it.

95. RealPage; THEA's prior owner, for which, on information and belief, Greystar priced the Unit with RealPage's software before Northland took title; and the owners and managers of Circa LA, Be DTLA, and the other properties in the relevant markets priced with RealPage's

software participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Northland, each Greystar entity, and Gottesdiener each joined, or directed adherence to, the combination with RealPage and those competing landlords. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint, including the overcharges the conspiracy caused Plaintiffs.

96. The relevant market is the leasing of conventional multifamily rental housing in the DTLA submarket or, alternatively, in the Los Angeles-Long Beach-Anaheim metropolitan area. In each relevant market, RealPage and the participating landlords, through their combined rental holdings, common pricing operation, and access to pooled confidential transactions, collectively have sufficient market power, including market and data penetration, to raise or stabilize rents, suppress concessions, and harm the competitive process and renters. The rents raised and stabilized above competitive levels and the concessions suppressed there, including THEA's rents held with 65 of its 685 units vacant at acquisition and the elimination of THEA's listed Renewal Concession from the Renewal Offer, are direct evidence of that power and of the agreement's anticompetitive effect.

97. The agreement unreasonably restrained trade in each relevant market. Among other effects: (a) competition among landlords for renters has been restrained or eliminated; (b) rents, including the Unit's $6,124 rent and its Renewal Offer terms, have been fixed, raised, stabilized, or maintained at artificially high levels, and concessions, including the listed Renewal Concession, have been suppressed; (c) units have been held empty rather than leased at competitive rents; and (d) renters, including Plaintiffs, have been deprived of free and open competition. The agreement has no valid procompetitive justification, and any theoretical benefit is outweighed by its harm to the competitive process and to renters.

98. The agreement is unlawful under the rule of reason and under a "quick look" analysis because its anticompetitive character is apparent and it has no valid procompetitive justification. In the alternative, as a horizontal agreement among competing landlords to fix rents through a common pricing agent, it is unlawful per se.

99. The conduct involved and substantially affected interstate commerce, including revenue management software and pooled lease data furnished across state lines by RealPage,

headquartered in Texas; pricing direction from Northland in Massachusetts; and rents set and collected in California for owners and managers based in Massachusetts and South Carolina.

100. Ruangtragool from the start of the lease, and Guhin from the date he was added as a cotenant, paid rent for the Unit directly to Greystar, a participant in the agreement, which received each payment from them and collected it for THEA's prior owner, a co-conspirator, and, after Northland took title, for Northland, their lessor and also a participant. Plaintiffs are direct purchasers entitled to sue each participant named in this Claim under 15 U.S.C. section 15.

101. As a result of the conspiracy, Plaintiffs paid more to rent the Unit than they would have paid in its absence. Each monthly rent payment Plaintiffs made for the Unit included an overcharge, in an amount according to proof. That overcharge is antitrust injury: it is the injury the antitrust laws were designed to prevent, and it flows from what makes the agreement unlawful, the replacement of independent pricing with rents generated from competitors' pooled data. Each Defendant is jointly and severally liable for all overcharges the conspiracy caused Plaintiffs.

102. Plaintiffs seek three times their damages according to proof, a reasonable attorney's fee, the cost of suit, and simple interest on actual damages under 15 U.S.C. section 15(a).

**SECOND CLAIM FOR RELIEF**

**Combination in Restraint of Trade, Cartwright Act, Business and Professions Code Sections 16720, 16726, and 16750**

(Against All Defendants)

103. Plaintiffs incorporate paragraphs 4 to 11, 16 to 29, 48 to 50, 69 to 84, 86, 87, and 89 to 101.

104. The contract, combination, and conspiracy among RealPage, Greystar, Northland, and the other participating landlords is a trust under Business and Professions Code section 16720. Its participants include RealPage; its landlord clients, including Greystar; the owners whose units those clients priced with RealPage's software, including Northland; and Gottesdiener, who authorized, directed, participated in, supervised, approved, or ratified that pricing for Northland. They combined their capital, skill, and acts to (a) create and carry out restrictions in trade and

commerce in the leasing of apartments in California, including in the DTLA and Los Angeles-Long Beach-Anaheim rental housing markets; (b) fix and control the rents charged to renters of those apartments in California; (c) establish and settle rents so as directly or indirectly to preclude free and unrestricted competition; and (d) pool, combine, and unite their lease-data and pricing interests so that rents might be affected, within section 16720, including subdivisions (a), (d), and (e). Every such trust is unlawful and void under section 16726.

105. Each Defendant named in this Claim knowingly joined and carried out the trust in California through its own acts. Greystar billed and collected the Unit's rent and, on information and belief, supplied THEA's lease data to RealPage and priced THEA's units with its software. Northland collected the Unit's rent and, on information and belief, kept THEA on that software after it took title and issued the Renewal Offer through Greystar. On information and belief, Gottesdiener authorized, directed, participated in, supervised, approved, or ratified that pricing for Northland, knowing that the software pooled competitors' nonpublic data and that the exchange was reciprocal.

106. The trust is unlawful under the rule of reason, including an abbreviated rule-of-reason analysis, and, in the alternative, per se. It was carried out in California, where the Unit and the competing apartments are located and where their rents were set and collected.

107. Defendants' conduct proximately caused injury to Plaintiffs by restraining competition and thereby raising, maintaining, or stabilizing the Unit's rent at levels above those that would have prevailed in a competitive market. Each monthly rent payment Plaintiffs made for the Unit included an overcharge caused by the trust, in an amount according to proof. Defendants' conduct restrained trade in the market in which Plaintiffs rented the Unit, and in paying overcharges as a result, each Plaintiff was injured in his property by reason of the trust and suffered an injury of a type the antitrust laws were designed to redress. Each Plaintiff may sue each Defendant named in this Claim under section 16750, subdivision (a), regardless of whether he dealt directly or indirectly with that Defendant, and each Defendant is jointly and severally liable for the overcharges the trust caused Plaintiffs.

108. Under section 16750, subdivision (a), each Plaintiff seeks three times his damages according to proof, interest on his actual damages under section 16761, a reasonable attorney's fee, and the costs of suit.

**THIRD CLAIM FOR RELIEF**

**Statutory Breach of the Implied Warranty of Habitability**

(Civ. Code, §§ 1941, 1941.1 et seq.)

(Against the Owner LLCs)

109. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, and 85.

110. The Owner LLCs assumed the written residential lease and its implied warranty that the Unit would remain habitable throughout the tenancy. They were required to repair conditions materially affecting habitability within a reasonable time after actual or constructive notice.

111. Until Plaintiffs surrendered the Unit, it had defective conditions that materially affected its habitability, including walls and ceilings opened in almost every room and left open, missing or disabled smoke and carbon monoxide alarms, deficient exterior waterproofing at the Unit's balcony and on the roof deck above it, and demolition debris and dust spread through the Unit and over Plaintiffs' contents. The County and LADBS cited the open walls and ceilings, in the Unit and throughout the building, and the missing or disabled smoke and carbon monoxide alarms as violations of the Los Angeles County Code and the Los Angeles Municipal Code, and ordered them corrected. Those conditions made the Unit a residential unit described in Health and Safety Code section 17920.3, including under subdivisions (a)(14), (c), (g), and (j), and so untenantable under Civil Code section 1941.1, subdivision (a). The Unit was also untenantable under section 1941.1 because it substantially lacked "[e]ffective waterproofing and weather protection of roof and exterior walls" (subd. (a)(1)), and the areas under the landlord's control were not kept "free from all accumulations of debris" (subd. (a)(6)). These conditions endangered Plaintiffs' health, safety, and property. They were not caused by Plaintiffs' acts or omissions in violation of Civil Code section 1929 or 1941.2.

112. The Owner LLCs had notice of the conditions through Greystar's work, Plaintiffs' written demands, and the County's and LADBS's reports and orders. Under the lease, written notice to management was notice to the owner. The Owner LLCs failed to restore the Unit within a reasonable time, letting each agency deadline and each announced repair schedule pass.

113. The Owner LLCs breached the implied warranty of habitability by failing to repair the Unit within a reasonable time after notice and by collecting and demanding rent while the conditions remained uncorrected, including after the County and LADBS cited them as

violations. Plaintiffs seek the rent paid for the period the Unit had no habitable rental value or, alternatively, the difference between the rent paid and the Unit's fair rental value in its actual condition, together with the resulting damages, including, but not limited to, substitute-housing, inspection, moving, and property damages, prejudgment interest under Civil Code section 3287, and attorney's fees under the lease and Civil Code section 1717.

**FOURTH CLAIM FOR RELIEF**

**Tortious Breach of the Implied Warranty of Habitability**

(Against Northland)

114. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, 85, 111, and 112.

115. By virtue of the landlord-tenant relationship and their ownership and control of THEA, the Owner LLCs owed Plaintiffs a duty to maintain the Unit in a habitable condition and to comply with the building, health, and safety laws governing it, including Civil Code sections 1941 and 1941.1 and Health and Safety Code section 17920.3, independent of the lease.

116. NIC undertook to perform, through Toqe and its asset-management personnel, the Owner LLCs' repair and maintenance obligations to THEA's tenants, including Plaintiffs, exercised control over THEA's repair approvals and work, and owed Plaintiffs reasonable care in performing those functions. Northland also breached its duty of care to Plaintiffs under Civil Code section 1714 by affirmatively choosing not to employ effective means to correct the conditions after Plaintiffs' written demands and the County's and LADBS's orders. Northland, directly, through NIC's asset management under Toqe, and through its agent Greystar, set, approved, or withheld approval for the repair schedule. Greystar, for Northland, directed the Repair Agents and left the Unit unrepaired.

117. The Owner LLCs had actual notice of the conditions and failed to repair them. They knew that permitting those conditions to continue threatened Plaintiffs' health, safety, and property. They exercised their control through NIC and Greystar and, through Toqe and Gottesdiener, authorized or ratified the continued failure to restore the Unit after notice. Their failure to correct the conditions was knowing, intentional, and malicious.

118. As a direct and proximate result, Plaintiffs were damaged in the rent paid while the Unit was in violation of Civil Code section 1941.1 and Health and Safety Code section 17920.3

or, in the alternative, in the difference between the rent paid and the Unit's fair rental value in its actual condition, and in other damages, including, but not limited to, the lost value of their leasehold, their substitute-housing, inspection, and moving costs, and their damaged and missing belongings, in amounts according to proof. On the tort ground, each Plaintiff also suffered discomfort, annoyance, anxiety, emotional distress, and fear for his safety resulting from interference with and impairment of his possessory interest in the Unit, and Plaintiffs seek punitive damages under Civil Code section 3294 against Northland for its malicious and oppressive conduct, which its officers and managing agents committed, authorized, or ratified. Plaintiffs also seek prejudgment interest under Civil Code sections 3287 and 3288 and costs.

**FIFTH CLAIM FOR RELIEF**

**Breach of the Covenant of Quiet Enjoyment**

(Civ. Code, § 1927)

(Against the Owner LLCs)

119. Plaintiffs incorporate paragraphs 4 to 10, 16 to 66, and 85.

120. The written lease and Civil Code section 1927 protected Plaintiffs' quiet possession and beneficial enjoyment of the Unit against any act or omission of the landlord, or anyone acting under its authority, that substantially interferes with the tenant's right to use and enjoy the premises for the purposes of the tenancy. Plaintiffs retained the lease and their right to possession until the surrender, including while the conditions and work kept them from living there.

121. Northland and Greystar, directly and through those acting under their authority, substantially interfered with Plaintiffs' beneficial use and possession of the Unit, including by ordering Plaintiffs out and leaving the Unit unrepaired, and the violations the County and LADBS cited uncorrected, past every compliance deadline and through the surrender; entering without Plaintiffs' consent or beyond the permission given; threatening Plaintiffs with charges and legal action; demanding full rent for the unrepaired Unit while withholding the credits promised in writing; covering Plaintiffs' cameras and posting guards who kept Plaintiffs from retrieving things they needed; and losing Plaintiffs' belongings in the Repair Agents' custody and removing their protective coverings while dusty work continued.

122. The Owner LLCs breached the lease's covenant of quiet enjoyment through those acts and omissions. Plaintiffs seek the resulting damages, including, but not limited to, loss of use and leasehold value, rent paid, temporary and replacement housing, moving, storage, and property losses, in amounts according to proof, together with prejudgment interest and attorney's fees under the lease and Civil Code section 1717.

**SIXTH CLAIM FOR RELIEF**

**Wrongful Constructive Eviction**

(Against Northland, Greystar, and Gottesdiener)

123. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, 85, 120, and 121.

124. Northland and Greystar, directly and through those acting under their authority, committed and directed the acts and omissions that substantially interfered with Plaintiffs' possession and rendered the Unit unfit for the purposes for which it was let, including by leaving the open walls and ceilings and the missing or disabled alarms the County and LADBS cited as violations uncorrected past every compliance deadline, keeping Plaintiffs from living in their home until they surrendered it. Their intent to deprive Plaintiffs of the Unit is shown by the character of those acts, including the repeated withholding of repairs after notice and agency orders. On information and belief, Gottesdiener, after learning of the conditions and Plaintiffs' demands through NIC's reporting and Plaintiffs' notice addressed in his care, authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop the continued nonrepair, withholding of credits, guard postings, and late-tenancy entries, and that conduct contributed to the forced surrender.

125. Plaintiffs deferred surrender in reliance on Northland's and Greystar's credit promises and repair schedules, including counsel's promise of a reconstruction to be completed by September 13, 2023. They kept the Unit available and sought restoration throughout. When the work remained unfinished and the County's and LADBS's cited violations uncorrected on September 13, Plaintiffs gave written notice that day. With those conditions continuing and further entries without consent, Plaintiffs elected to treat the interference as an eviction and surrendered the Unit within a reasonable time after the promised restoration failed.

126. As a direct and proximate result, each Plaintiff suffered damages, including, but not limited to, the loss of the possession and use of his home and the value of the leasehold, moving, storage, and temporary and replacement housing costs, lost property, and discomfort, annoyance, distress, and fear for his safety accompanying the injury to his possessory interest, in amounts according to proof. Greystar is also liable as a principal under Civil Code section 2343 for its wrongful acts in the course of its agency. Defendants acted with malice and oppression, and Plaintiffs seek punitive damages under Civil Code section 3294.

## SEVENTH CLAIM FOR RELIEF

### Breach of Written Lease and Express Agreements

(Against the Owner LLCs)

127. Plaintiffs incorporate paragraphs 4 to 10, 16 to 66, and 85.

128. The Owner LLCs assumed Plaintiffs' written lease when they acquired THEA, became the lessor under it, accepted the rent paid under it, and undertook the lessor's obligations. In the alternative, on information and belief, each Owner LLC shared in the rent Plaintiffs paid and, having accepted the benefit of the lease, is bound by its obligations under Civil Code section 1589.

129. The lessor also agreed in writing: (a) through Greystar, to credit the days Plaintiffs were affected (the "affected-day credit promise"); (b) through Jones, that there would be no entry to the Unit until Jones reviewed it with Plaintiffs and they approved it together (the "joint-approval agreement"); (c) through counsel, to provide a daily rent credit for each day Plaintiffs were required to temporarily relocate (the "daily-credit promise"); and (d) through counsel, that the vendor would cover all personal belongings with a protective plastic covering before commencing the work (the "covering promise"). Greystar and Jones made the affected-day credit promise and the joint-approval agreement with actual or ostensible authority as the managing agent the lease names as "Owner or Owner's Agent," whose written notices the lease makes the owner's own. Northland's counsel, who signed the Notice to Enter as "Attorneys for the owner" for all five Owner LLCs, made the daily-credit promise and the covering promise. The Owner LLCs ratified each agreement by accepting its benefits: Plaintiffs' continued tenancy, rent, access, preparation of the Unit, and absence for the work.

130. Plaintiffs gave consideration for each agreement that they were not then lawfully bound to give. For the affected-day credit promise, they forbore from vacating the untenantable Unit and ending their rent obligation under Civil Code section 1942, maintained the tenancy, and paid their own temporary-housing costs. For the joint-approval agreement, they provided access for the work on joint approval. For the daily-credit promise, they stayed away from the Unit for the reconstruction. For the covering promise, they prepared the Unit and left their belongings in the Repair Agents' custody for the work. These acts furnished consideration under Civil Code section 1605.

131. Plaintiffs performed their obligations under the lease and the written agreements, or their performance was prevented or excused by the Owner LLCs' prior material breaches, the untenantable conditions, and the credits owed. Plaintiffs gave repair notices, maintained access for the work, and undertook the required preparation and relocation. All conditions to the Owner LLCs' performance occurred or were excused, including conditions the Owner LLCs prevented by failing to complete the work.

132. The Owner LLCs breached the lease and the written agreements by, among other things: (a) failing to repair with customary diligence, contrary to lease paragraph 27, including by letting every County and LADBS compliance deadline pass; (b) failing to restore the smoke and carbon monoxide alarms required by lease paragraph 25, which LADBS cited as missing or disabled; (c) through the Repair Agents, entering before the time noticed and without written notice when no emergency existed, contrary to lease paragraph 29; (d) entering without the joint review and approval the joint-approval agreement required; (e) through the Repair Agents, removing the protective coverings while dusty work continued, contrary to the covering promise; (f) failing to apply the affected-day credit, contrary to the affected-day credit promise; and (g) failing to apply the daily relocation credit and demanding the full September rent without it, contrary to the daily-credit promise.

133. The breaches deprived Plaintiffs of the benefit of their bargain, including the promised credits, the rent paid for months they could not occupy the Unit, and the value of their leasehold. They also caused consequential damages, including, but not limited to, temporary-housing, inspection, and moving expense and damage to and loss of Plaintiffs' belongings. Plaintiffs seek damages under Civil Code section 3300 in amounts according to proof, prejudgment interest

under Civil Code section 3287, and reasonable attorney's fees under the lease and Civil Code section 1717.

**EIGHTH CLAIM FOR RELIEF**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

(Against the Owner LLCs)

134. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, 85, and 128 to 131.

135. In the alternative, the Owner LLCs breached the implied covenant of good faith and fair dealing. The lease and the written agreements left the lessor, acting through Greystar, Jones, and its counsel, discretion over whether the repairs required Plaintiffs' absence, what preparation the work required, and when and how the work proceeded. The lessor exercised that discretion to frustrate the agreed common purpose of restoring the Unit for Plaintiffs' occupancy and to deprive Plaintiffs of the promised credits, including as follows: through its counsel, it offered the previously promised affected-day credit only if Plaintiffs signed the Release, giving up their habitability claims and withdrawing their agency complaints; through Jones, it escalated its preparation demands beyond what the contractor's supervisor said was sufficient; through Jones, it gave a false permit excuse for the missed reconstruction start; and it left the Unit unrestored through the surrender while charging full rent. That conduct was prompted not by an honest mistake, bad judgment, or negligence but by conscious and deliberate acts, which unfairly frustrated the agreed common purposes, disappointed Plaintiffs' reasonable expectations, and deprived them of the benefits of the lease and the agreements.

136. The release-conditioned credit offers, the escalating preparation demands, and the false permit excuse prolonged Plaintiffs' displacement and deprived them of the promised credits, the rent paid for months they could not occupy the Unit, and the value of their leasehold, and caused consequential damages, including, but not limited to, temporary-housing, inspection, and moving expense and damage to and loss of their belongings. Plaintiffs seek damages under Civil Code section 3300 in amounts according to proof, prejudgment interest under Civil Code section 3287, and reasonable attorney's fees under the lease and Civil Code section 1717.

## NINTH CLAIM FOR RELIEF

**Private Nuisance**

(Against Northland, Greystar, and Gottesdiener)

137. Plaintiffs incorporate paragraphs 4 to 10, 16 to 26, 30 to 36, 38, 44 to 47, 53 to 55, 57 to 68, and 85.

138. Plaintiffs leased and occupied the Unit and held the right to possess it until they surrendered it.

139. By acting and failing to act, Northland and Greystar created a condition, or permitted a condition to exist, that was injurious to health and a substantial and unreasonable obstruction to the free use of Plaintiffs' residence, so as to interfere with their comfortable enjoyment of life and property, within the meaning of Civil Code sections 3479 and 3481. The condition consisted of walls and ceilings open in almost every room, missing or disabled smoke and carbon monoxide alarms, deficient exterior waterproofing at the Unit's balcony and on the roof deck above it, and demolition debris and dust throughout. The County and LADBS cited the open walls and ceilings, in the Unit and in the building's common areas, and the missing or disabled alarms as violations, and the condition made the Unit substandard under Health and Safety Code section 17920.3, including as a nuisance within subdivision (c). The Repair Agents' entries without Plaintiffs' consent and the guards stationed at the Unit's door after the workers left aggravated that interference.

140. Northland and Greystar knew of the conditions from their own work, Plaintiffs' written demands, and the County's and LADBS's notices and orders, and, although required by law to abate them, intentionally left them unabated past every County and LADBS compliance deadline and through surrender with full knowledge of the damage being caused to Plaintiffs. The Owner LLCs controlled the property through NIC and Greystar; NIC supervised the approvals and work through its asset-management operation under Toqe; and Greystar directed the Repair Agents and on-site access. On information and belief, Gottesdiener, personally and through Toqe, authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop that continued nonrepair after learning of the conditions and Plaintiffs' demands through NIC's reporting and Plaintiffs' notice addressed in his care. In the alternative, each Defendant negligently failed to abate conditions within its control after notice; on

information and belief, Gottesdiener, knowing that the open walls and ceilings and the missing or disabled alarms endangered Plaintiffs in a Unit whose repairs NIC and the Owner LLCs of which he was chief executive officer controlled, failed to take or order action to correct them. The nuisance was continuing and could have been abated at any time by completing the reconstruction.

141. Plaintiffs did not consent to the conditions or their continuation. The interference was substantial: it kept Plaintiffs out of their home until they surrendered it. An ordinary person would be reasonably annoyed and disturbed by it. The interference was unreasonable, and the seriousness of the harm outweighed any public benefit of the conduct.

142. The conduct of Northland, Greystar, and Gottesdiener was a substantial factor in causing each Plaintiff harm, including loss of residential use and leasehold value, rent paid for unusable days, displacement and moving expenses, damage to and loss of property, and discomfort, annoyance, emotional distress, and fear for his safety resulting from interference with and impairment of his possessory interest in the Unit, in amounts according to proof. Plaintiffs seek compensatory damages under Civil Code section 3333, prejudgment interest under Civil Code sections 3287 and 3288, costs, and punitive damages under Civil Code section 3294 against each Defendant named in this Claim for the malicious and oppressive maintenance of the nuisance.

**TENTH CLAIM FOR RELIEF**

**Negligent Damage to Personal Property**

(Civ. Code, § 1714)

(Against Northland and Greystar)

143. Plaintiffs incorporate paragraphs 4 to 10, 16 to 26, 30 to 36, 38, 44 to 47, 53 to 55, 57 to 66, and 85.

144. The Owner LLCs owed a nondelegable duty of reasonable care as owners and lessors to keep the Unit reasonably safe. NIC undertook supervision of the repair, capital, access, and property-protection operation through Toqe and its personnel. Greystar managed the Unit, directed the Repair Agents who demolished and rebuilt it, controlled access, and undertook to protect the belongings Plaintiffs left at its direction. Each owed Plaintiffs reasonable care in

performing those functions, in maintaining and repairing the Unit, in conducting and supervising the demolition and reconstruction work, and in safeguarding the belongings it accepted into its care. Those duties arose from ownership, retained control, the undertakings alleged here, Civil Code section 1714, and the housing laws Northland and Greystar violated, independently of the lease promises.

145. Northland and Greystar knew of the Unit's condition from their own Repair Agents' work, Plaintiffs' written demands, and the County's and LADBS's inspections, reports, and orders.

146. Northland and Greystar breached that duty, including as follows: (a) after the Repair Agents opened the walls and ceilings of almost every room, they left Plaintiffs' contents inadequately covered and coated with demolition dust and debris, without air scrubbers in place; (b) they failed to secure the Unit and the belongings left there while the Repair Agents entered and handled them in Plaintiffs' absence, and goods in their care went missing; (c) they left the walls, ceilings, and smoke and carbon monoxide alarms unrepaired after Plaintiffs' written demands and the County's and LADBS's orders; (d) they removed the promised protective coverings while dusty work continued, so that new dust and debris damaged Plaintiffs' belongings; (e) they failed to properly supervise the Repair Agents and other vendors they employed to remediate and repair the Unit; and (f) they failed to maintain effective exterior waterproofing at the Unit's balcony and on the roof deck above it.

147. The Owner LLCs violated Civil Code sections 1941 and 1941.1. Northland and Greystar, through the repair and access operations each controlled, violated Health and Safety Code section 17920.3, Los Angeles County Code sections 11.20.140, 11.20.160, and 11.20.170, which the County cited, and the permit, wall and ceiling repair, smoke alarm, and carbon monoxide alarm provisions of the Los Angeles Municipal Code that LADBS cited, by opening the walls without a permit and leaving the Unit with open walls and ceilings, missing or disabled alarms, deficient exterior waterproofing at the Unit's balcony and on the roof deck above it, and demolition debris and dust. Plaintiffs, as tenants of the Unit, were within the class those enactments protect. The damage to their belongings, the loss of use of their tenancy, and the dangers to their health and safety are the kind of harm the enactments were designed to

prevent. The violations proximately caused that harm and raise a presumption of negligence under Evidence Code section 669.

148. Each breach was a substantial factor in causing Plaintiffs harm, including, but not limited to, damage to and loss of Plaintiffs' belongings and residential use, resulting cleaning, replacement, substitute-housing, and moving costs, and the discomfort, annoyance, and distress accompanying injury to their property and tenancy. NIC and Greystar are liable for their negligent performance of the functions they undertook. The Owner LLCs are liable for their own breaches and, because their duty was nondelegable and NIC and Greystar acted as their agents, for NIC's and Greystar's negligent performance of that duty. Plaintiffs seek compensatory damages under Civil Code section 3333.

**ELEVENTH CLAIM FOR RELIEF**

**Breach of Bailment**

(Against Northland and Greystar)

149. Plaintiffs incorporate paragraphs 4 to 10, 16 to 26, 30 to 33, 35, 36, and 85.

150. Greystar directed Plaintiffs to leave their belongings when it ordered them out. Greystar then controlled access to the Unit in Plaintiffs' absence, and the Repair Agents took possession of, moved, and handled those belongings. Greystar undertook in writing to protect the belongings. Through that direction, exclusion, handling, and undertaking, Northland and Greystar took possession of the belongings and accepted custody of them for safekeeping during the work and return afterward. Each Plaintiff owned the belongings for which he seeks relief.

151. The bailment benefited both sides. It protected Plaintiffs' belongings while allowing Northland and Greystar to perform the work they had chosen to perform with the belongings in place, as an incident of leasing and managing the Unit for which Greystar collected rent for Northland. As bailees for mutual benefit and depositaries for hire, Northland and Greystar owed Plaintiffs at least ordinary care to preserve the belongings and to return them at the end of the work under Civil Code sections 1851 and 1852.

152. Plaintiffs reported the missing goods to Greystar in writing; Northland and Greystar returned none, and Plaintiffs received their remaining belongings damaged by the work. Because goods belonging to each Plaintiff were already missing from Northland's and Greystar's

custody when Plaintiffs reported the loss, any further demand would have been futile. Northland and Greystar breached the bailment by failing to exercise ordinary care to preserve the goods, by failing to return the missing goods, and by returning the rest damaged. In the alternative, if the deposit was gratuitous, leaving the goods unsecured and exposed to demolition damage failed to meet the slight care required by Civil Code section 1846, subdivision (a).

153. The breach caused each Plaintiff damages, including, but not limited to, the value and loss of use of his missing goods and the cost of cleaning, repairing, or replacing, or the diminished value of, his damaged goods, in amounts according to proof.

**TWELFTH CLAIM FOR RELIEF**

**Trespass**

(Against Northland, Greystar, and Gottesdiener)

154. Plaintiffs incorporate paragraphs 4 to 10, 16 to 26, 30 to 33, 35 to 37, 39 to 43, 53 to 68, and 85.

155. Plaintiffs leased and were in lawful possession of the Unit on each date of entry, including while Northland and Greystar kept them out of the Unit. They held the lease and their keys and did not abandon the Unit.

156. Northland and Greystar, through the Repair Agents they hired, directed, or admitted, intentionally entered, caused others to enter, or remained in the Unit without Plaintiffs' consent or other lawful authority, or beyond the permission given, on dates including each of the following: (a) March 31, 2023, before the time Greystar's notice had set; (b) April 3, 2023, when Greystar's maintenance staff photographed Plaintiffs' private belongings and living areas, which the work did not require; (c) April 5, 2023, after Plaintiffs' written objections; (d) May 3, 2023, without notice or permission; (e) September 18, 2023; (f) September 19, 2023, each after the Notice to Enter period ended and without the joint approval Jones agreed to in writing for Northland; and (g) other entries during the displacement without Plaintiffs' consent or beyond the permission given. The entries in (b) through (g) were made without the written notice Civil Code section 1954 requires, and no emergency required them.

157. Northland and Greystar, through the repair and access operations they controlled, authorized, directed, participated in, or ratified each entry. Toqe received Plaintiffs' written

objection to the September 18 entry before the September 19 entry proceeded. On information and belief, Gottesdiener learned of the ongoing access and repair dispute through NIC's reporting and Plaintiffs' notice addressed in his care, and authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop the late-tenancy access practices, including the September 18 and 19 entries.

158. Each entry was a substantial factor in harming Plaintiffs' possession, privacy, and security and caused each Plaintiff harm, including, but not limited to, annoyance and distress resulting from interference with his possessory interest in the Unit. Plaintiffs seek compensatory damages for each entry or, in the alternative, nominal damages under Civil Code section 3360. On information and belief, Toqe, for Northland, and Jones, who received Plaintiffs' notice, for Greystar, authorized, directed, or ratified those entries. Those entries were knowing and in willful and conscious disregard of Plaintiffs' right to possession, and Plaintiffs seek punitive damages under Civil Code section 3294 against each Defendant that authorized or ratified them.

**THIRTEENTH CLAIM FOR RELIEF**

**Demanding Rent for an Untenantable Dwelling**

(Civ. Code, § 1942.4)

(Against Northland and Greystar)

159. Plaintiffs incorporate paragraphs 4 to 10, 16 to 26, 30 to 34, 38, 44 to 55, 57 to 66, and 85.

160. The Owner LLCs were the Unit's lessor. NIC and Greystar exercised the landlord's rent-demand and collection functions through their asset-management and property-management operation, and Northland and Greystar were each a landlord of the Unit or acted as the landlord's agent. The Owner LLCs are liable for the rent demands Greystar issued for them. On information and belief, NIC and Greystar directed or authorized those demands knowing of the uncorrected conditions.

161. Until the surrender, the Unit's open walls and ceilings, missing or disabled smoke and carbon monoxide alarms, deficient exterior waterproofing at the Unit's balcony and on the roof deck above it, and demolition debris and dust throughout were general dilapidation and improper maintenance within Health and Safety Code section 17920.3, subdivision (a)(14),

faulty weather protection within subdivision (g), and, in the alternative, a nuisance within subdivision (c) and an accumulation of debris constituting a health or safety hazard within subdivision (j). They existed to an extent that endangered the health, property, safety, and welfare of the occupants, so the Unit was deemed and declared substandard under section 17920.3. In the alternative, the Unit lacked effective waterproofing and weather protection of roof and exterior walls and, while it was under Northland's and Greystar's control during the work, was not kept clean, sanitary, and free from accumulations of debris, and so substantially lacked the affirmative standard characteristics listed in Civil Code section 1941.1, subdivisions (a)(1) and (a)(6).

162. The County's Environmental Health inspectors and LADBS's inspector are public officers or employees responsible for enforcing housing law, including Los Angeles County Code sections 11.20.140, 11.20.160, and 11.20.170 and the Los Angeles Municipal Code. After inspecting the Unit, they notified the landlord or the landlord's agents in writing of the obligation to repair the substandard conditions: (a) by the County's June 23, 2023 Official Inspection Report, presented that day to the person in charge at the tower and served on the manager by email on June 27, 2023; (b) by the County's July 18, 2023 re-inspection report, served on the manager by email on July 19, 2023; and (c) by LADBS's July 31, 2023 Order to Comply, addressed to Northland Thea Portfolio LLC at 2150 Washington Street, Newton, Massachusetts, which, on information and belief, was served by mail on or about its date of issuance.

163. The noticed conditions existed and were not abated 35 days beyond the date of service of each notice. On July 29, 2023, the holes remained open more than 35 days after the County's June 23 report was presented, and on August 24, 2023, more than 35 days after the County's June 27 and July 19 emails.

164. Northland and Greystar had no good cause for the delay, which persisted despite the multimillion-dollar value-add budget Gottesdiener publicized for THEA. Plaintiffs did not cause the conditions by any act or omission violating Civil Code section 1929 or 1941.2.

165. While those conditions existed, Greystar, for Northland, demanded the full $6,124 base rent for the Unit on July 29, 2023, for August, and on August 24, 2023, for September. Each demand violated Civil Code section 1942.4, subdivision (a).

166. As a direct and proximate result, the unlawful demands caused each Plaintiff actual damages, including, but not limited to, discomfort, anxiety, and distress resulting from interference with his possessory interest in the Unit, in amounts according to proof. Each Plaintiff seeks his actual damages and special damages of not less than $100 nor more than $5,000 under Civil Code section 1942.4, subdivision (b)(1), and Plaintiffs seek reasonable attorney's fees and costs under subdivision (b)(2).

**FOURTEENTH CLAIM FOR RELIEF**

**Retaliation**

(Civ. Code, § 1942.5)

(Against Northland, Greystar, and Gottesdiener)

167. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, and 85.

168. The Owner LLCs were Plaintiffs' lessor. NIC, as their asset manager, Greystar, as their property manager, and Gottesdiener, as an officer of NIC and three of the Owner LLCs, acted as the lessor's agents. Each is liable under Civil Code section 1942.5, subdivision (h), as a lessor or an agent of a lessor, for the retaliatory acts it committed, authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop.

169. Plaintiffs lawfully and peaceably exercised their rights under the law, including by giving written notice of the Unit's conditions and demanding repair; bringing code complaints to LAHD, LADBS, and the County; having police called to the Unit; filing a harassment complaint with LAHD; and giving written notice of the conditions and the agencies' citations to Northland's officers on September 13, 2023.

170. Each Defendant knew of that activity. Greystar knew from Plaintiffs' demands to its management, the agencies' inspections, reports, and notices, the police call, LAHD's notice to Jones of the harassment complaint, and its own employees' statements about Plaintiffs' complaints. Northland knew from the agencies' notices addressed to it at NIC's office, LAHD's notice to Northland Thea Portfolio LLC, Plaintiffs' September 13 letter and their email to Toqe, and through Greystar, whose knowledge as its agent is Northland's. Gottesdiener knew from that letter, addressed in his care, and, on information and belief, from NIC's reporting.

171. For the purpose of retaliating against Plaintiffs for that activity, Northland and Greystar did acts including each of the following, each unlawful under Civil Code section 1942.5, subdivision (d):

(a) They increased the rent charged for the days Plaintiffs could not use the Unit by keeping the promised affected-day and daily relocation credits off every account, conditioning the affected-day credit on the Release's withdrawal of Plaintiffs' agency complaints, and demanding the full base rent, including by a statement sent three days after LAHD's notice of the harassment complaint.

(b) They decreased services by withholding the repairs the County and LADBS had ordered past the agencies' deadlines, and by not starting the reconstruction when scheduled while blaming a City permit that had already issued.

(c) They threatened to bring an action to recover possession of the Unit and to cause Plaintiffs to quit, by serving the two three-day notices demanding the full rent or possession without applying the promised affected-day credit.

(d) After Plaintiffs' September 13 notice, they kept the repairs and the promised credits withheld and entered the Unit on September 18 and 19 without consent.

(e) Through those acts and the uncorrected conditions, they caused Plaintiffs to quit the Unit involuntarily.

172. Northland's and Greystar's retaliatory purpose is shown by: (a) Greystar's leasing manager's statement, in Plaintiffs' and the officers' presence, blaming the repair delays on Ruangtragool's complaints to government agencies, and Greystar's community manager's concurrent misstatement to the officers of what the agencies had said about the Unit; (b) the Release, which made withdrawal of the agency complaints the price of a credit Greystar had promised before any agency complaint; (c) Jones's threats to Ruangtragool one week after Plaintiffs' complaints to LADBS and the County; (d) Jones's warning that preparation or access disputes would close Plaintiffs' agency complaints, which LADBS disavowed the same day; (e) Jones's and management's false reports to the County that Plaintiffs were denying access; (f) the two three-day notices demanding the full rent or possession, on which no unlawful detainer followed; and (g) the timing of each act, which followed Plaintiffs' demands and complaints.

173. On information and belief, Gottesdiener, after learning of Plaintiffs' demands and agency complaints through NIC's reporting and Plaintiffs' notice addressed in his care, authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop acts (d) and (e) and the continued withholding of the affected-day credit.

174. In the alternative, Northland and Greystar also violated subdivision (a). Plaintiffs' March 28 and 31, 2023 written notices of the Unit's untenantable condition were good-faith notices under Civil Code section 1942. Plaintiffs were not then in default as to the payment of rent. Within 180 days after those notices, Ruangtragool's April 13 and 18, 2023 code complaints to LAHD, and Plaintiffs' May 3, 2023 written complaints to LADBS and the County of the Unit's untenantable condition, and because of them, Northland and Greystar decreased services by withholding the rebuilding of the Unit.

175. The retaliation proximately caused each Plaintiff injury, including, but not limited to, economic loss, loss of use of his home, substitute-housing expenses, discomfort, and emotional distress resulting from interference with and impairment of his possessory interest in the Unit, in amounts according to proof. Each Plaintiff seeks his actual damages under Civil Code section 1942.5, subdivision (h)(1), and punitive damages of not less than $100 nor more than $2,000 under subdivision (h)(2) for each retaliatory act committed against him with fraud, oppression, or malice. Plaintiffs request reasonable attorney's fees under subdivision (i) and costs.

**FIFTEENTH CLAIM FOR RELIEF**

**Tenant Harassment**

(L.A. Mun. Code, §§ 45.33, 45.35)

(Against Northland, Greystar, and Gottesdiener)

176. Plaintiffs incorporate paragraphs 4 to 10, 16 to 68, and 85.

177. The Unit was a rental unit in the City of Los Angeles subject to the Tenant Anti-Harassment Ordinance in effect in 2023, Ordinance No. 187109. Plaintiffs were tenants, and Northland and Greystar were landlords, within Los Angeles Municipal Code section 45.32. On information and belief, Gottesdiener was also a landlord within section 45.32: during the events alleged here he, with NIC, controlled and possessed THEA and directed the management of the Owner LLCs' assets and revenues, including the Unit's rent, and, as chief executive officer of

NIC and three of the Owner LLCs, he acted as principal and through NIC and Toqe as his agents and representatives. Section 45.32's definition includes managers and qualifying persons and entities acting as principal or through an agent, representative, or successor. Independently and in the alternative, Los Angeles Municipal Code section 45.35(A) reaches any person who aids, facilitates, and/or incites another to violate the ordinance. On information and belief, Gottesdiener aided, facilitated, and incited Northland's and Greystar's violations, including by authorizing, directing, supervising, approving, or ratifying the wrongful conduct alleged in this Claim.

178. Throughout the events alleged here, Northland and Greystar knowingly and willfully engaged in a course of conduct, including nonrepair, access abuses, threats, false reports, and financial pressure, that interfered with Plaintiffs' home and their efforts to secure its restoration. The course was directed at Plaintiffs, caused detriment and harm, and served no lawful purpose. It escalated after their repair demands and agency complaints and continued after LAHD's August 21 harassment warning to Jones and Northland Thea Portfolio LLC. Greystar's May 7 and June 15, 2023 three-day notices, served while the Unit stood open and the promised credits were unapplied, and on which no unlawful detainer followed, show that the course was knowing and willful. Each notice was also a separate violation: Greystar, for Northland, threatened to terminate the tenancy by a notice to quit based on facts it had no reasonable cause to believe true, because the full $6,124 it demanded was not owed once the promised affected-day credit, which by then covered more than a month of displacement, was applied, and because Greystar knew the Unit was uninhabitable (§ 45.33(7)).

179. Plaintiffs' written notices notified Northland through Greystar of the uninhabitable conditions and requested repair. Their later writings gave notice of the continuing conditions, including the open walls and ceilings, the missing or disabled alarms, and the dust, property-protection, and maintenance problems. Northland and Greystar failed to remedy the repair and maintenance issues within a reasonable time after written notice, and past every County and LADBS compliance deadline, before suit, satisfying section 45.35(F).

180. Northland and Greystar failed to perform and timely complete necessary repairs required by housing, health, and safety laws, including restoring the opened walls and ceilings, the required smoke alarms, and the required carbon monoxide alarms, after Plaintiffs' written

demands and the County's and LADBS's repair directions, and repeated opportunities for correction. Each failure deprived both Plaintiffs of safe residential use (§ 45.33(2), (8)).

181. Throughout the work, Northland and Greystar left demolition dust on inadequately protected household contents without air scrubbers or adequate dust controls. Northland and Greystar failed to follow applicable industry standards to minimize exposure to dust, contaminating Plaintiffs' belongings and making the apartment unusable (§ 45.33(2), (8)).

182. Northland and Greystar committed separate access violations against both Plaintiffs, including on March 31, April 3, April 5, May 3, September 18, and September 19. They entered, caused entry, or remained without permission or lawful authority, or beyond the permission given. On March 31, the Repair Agents entered before the announced window; the September entries also disregarded the agreed coordination procedure, Jones's May 10 written agreement that "there will not be any entry to #1625 until I review with you and we approve together going forward" (§ 45.33(3), (8)).

183. On April 3, Greystar's maintenance staff abused the right of access by photographing Plaintiffs' private living areas, portions of the Unit beyond the scope of a lawful entry or inspection, invading both Plaintiffs' residential privacy (§ 45.33(3), (15)).

184. On April 3, after Plaintiffs obtained Servpro's independent assessment, Jones threatened Ruangtragool with further repair charges and recourse to legal counsel. That pressure interfered with Plaintiffs' efforts to protect their home and belongings (§ 45.33(8), (16)).

185. Jones renewed the chargeback threat in a separate April 4 email to both Plaintiffs, pressuring them against independent protective measures while Northland and Greystar retained control of the unrestored Unit (§ 45.33(8), (16)).

186. On April 28, 2023, Jones acknowledged that reconstruction had made no progress, yet directed Plaintiffs to finance continued hotel stays or return to the unrestored Unit, despite their repair demands and the promised credits. That direction denied housing services and residential use and pressured Plaintiffs to surrender or waive tenancy rights (§ 45.33(2), (8), (16)).

187. On May 10, one week after Plaintiffs' May 3 agency complaints, Jones told Ruangtragool, "we will come after you if you ever call the police again" and "we know where you live." Coming from the manager who controlled access to the home, those statements

threatened Ruangtragool with physical harm, intimidated him against seeking police assistance, and disturbed both Plaintiffs' residential security (§ 45.33(4), (16)).

188. On May 25, Greystar, through its community manager Darrell Wilmore, refused to acknowledge Ruangtragool's lawful rent payment, telling his insurer that he had not paid his rent although Greystar's own ledger showed the payment. Ruangtragool had to produce the ledger to obtain the acknowledgment. The report obstructed his insurance claim and increased financial pressure (§ 45.33(8), (9), (16)).

189. On information and belief, Wilmore knowingly and falsely told Ruangtragool's insurer on May 25, 2023 that LADBS had confirmed the Unit habitable. That misrepresentation misled the insurer and contributed to the denial of Ruangtragool's displacement coverage, leaving him to bear unreimbursed displacement expenses. The conduct formed part of the knowing and willful course of harassment that interfered with Plaintiffs' residential use and tenancy rights (§ 45.33(8), (16)).

190. On June 19, Greystar, through its concierge Dawanda Brown, falsely told Guhin his renter's insurance had expired and threatened lease-violation fees. His policy remained in effect, as he demonstrated that day. The unfounded fee threat imposed financial pressure on Guhin and disturbed his peace and quiet (§ 45.33(16)).

191. Northland and Greystar repeatedly deferred restoration, including past their June 22 schedule for July 31 to August 16, their August 3 schedule beginning August 14, and the September 13 completion deadline, prolonging Plaintiffs' displacement despite their cooperation and substantially interfering with both Plaintiffs' use of the home (§ 45.33(2), (8), (16)).

192. On July 17, the day the County told Jones the repairs must be expedited, Jones reported to the County that the tenant had a history of denying access, although Plaintiffs had confirmed in writing on June 13 that they were not denying access. On information and belief, Greystar, through Jones, knowingly used that false account to discredit Plaintiffs' protected repair complaints and shift responsibility for the delay to them (§ 45.33(8), (12), (16)).

193. On July 21, while police took Ruangtragool's report of missing belongings, Greystar's leasing manager Natalyt Estrada blamed the repair delays, in front of the officers and Plaintiffs, on Ruangtragool's complaints to government agencies. That statement targeted Plaintiffs for

seeking enforcement of their housing rights and undermined their request for assistance (§ 45.33(8), (12), (16)).

194. At the same encounter, Wilmore separately misstated to the officers, in Ruangtragool's presence, what LADBS and the other agencies had said about the Unit, despite Greystar's knowledge of its condition. As part of the retaliatory response to Plaintiffs' complaints, that representation to police discredited Plaintiffs' account and further interfered with their pursuit of a safe home (§ 45.33(8), (12), (16)).

195. Northland, through counsel, made release-conditioned credit offers on July 20, August 3, and August 11, each withholding the affected-day credit promised on March 28 unless Plaintiffs released their tenancy-related claims and withdrew their agency complaints, and so pressured Plaintiffs to surrender those rights (§ 45.33(8), (16)).

196. Northland's and Greystar's separate July 29 and August 24 payment demands, the latter sent three days after LAHD's harassment notice to Jones and Northland Thea Portfolio LLC, sought full rent for the continuing displacement while the promised credits remained withheld, compounding both Plaintiffs' financial pressure (§ 45.33(8), (16)).

197. On August 11, Northland wrote through counsel that "our client did not force you to vacate in March 2023," contrary to Greystar's March 28 written admission, "Yes, you were told to vacate." Northland made the false account to justify withholding the promised affected-day credit and to pressure Plaintiffs to sign the Release and withdraw their agency complaints (§ 45.33(8), (16)).

198. Northland's and Greystar's August 15 report to the County and Jones's August 16 statement to Ruangtragool falsely blamed the missed August 14 start on a pending City permit; the permit had issued July 26. The false explanations obstructed Plaintiffs' efforts to obtain prompt restoration (§ 45.33(8), (16)).

199. On August 25, after Plaintiffs sent him the LADBS inspector's correction on August 18, Jones repeated the pending-permit excuse in an email copying County inspectors. That renewed misrepresentation was a separate act supporting continued delay and further conditions on the repairs (§ 45.33(8), (16)).

200. Jones's August 17 warning that preparation or access disputes would close Plaintiffs' enforcement complaints used purported government authority to pressure them and threatened their means of obtaining repairs. LADBS disavowed that claim the same day (§ 45.33(8), (16)).

201. Jones escalated preparation demands to "a clean line up to 6ft" on August 21, the day LAHD notified Jones and Northland Thea Portfolio LLC of Plaintiffs' harassment complaint, although the contractor's supervisor said three feet was sufficient. The excessive demand imposed unnecessary preparation on Guhin, obstructed restoration, and interfered with both Plaintiffs' use of the home (§ 45.33(8), (16)).

202. On August 21 and 22, beginning the day LAHD notified Jones and Northland Thea Portfolio LLC of the harassment complaint, Northland and Greystar reported to the County that Plaintiffs were denying access. The reports were false: Plaintiffs prepared the Unit, walked it with the contractor's supervisor on August 22, and, as Jones confirmed in writing, Ruangtragool admitted the workers on August 23. On information and belief, Northland and Greystar used the false reports to retaliate against Plaintiffs' enforcement complaints and shift responsibility for nonrepair to them (§ 45.33(8), (12), (16)).

203. The Repair Agents' August 31 covering of the kitchen security camera without permission exceeded the authorized work and blocked both Plaintiffs' monitoring of that area and their belongings until Guhin uncovered it on September 1, interfering with their residential use and privacy (§ 45.33(8), (15)).

204. The Repair Agents separately covered the shared camera in Ruangtragool's bedroom on August 31, obstructing monitoring and protection of that private area, which no part of the work required, until September 1 (§ 45.33(8), (15)).

205. During September, Northland and Greystar repeatedly kept guards at the Unit after the workers left, beyond the contractors' work hours, preventing Plaintiffs from retrieving belongings needed for daily living and work. The postings continued despite Plaintiffs' written objections to Jones and Toqe and intruded on Plaintiffs' possession, privacy, and residential security (§ 45.33(8), (15), (16)).

206. The Repair Agents' September 13 removal of the protective coverings before dusty reconstruction ended, contrary to Northland's August 11 written promise and applicable industry

standards to minimize exposure to dust, exposed Plaintiffs' contents to additional dust and debris damage (§ 45.33(2), (8)).

207. The Repair Agents' acts occurred in the repair and access operation Northland and Greystar directed: Greystar directed the on-site repair and access operation, and Northland, through Toqe, directed and supervised it. On information and belief, Gottesdiener, after learning of the continuing conditions and complaints through NIC's reporting and Plaintiffs' September 13, 2023 notice addressed in his care, personally and through Toqe authorized, directed, participated in, supervised, approved, ratified, or with knowledge failed to stop, and so knowingly aided, facilitated, and incited, the violations alleged in this Claim, including the continuing nonrepair, guard, and access violations and the continued withholding of the affected-day credit unless Plaintiffs signed the Release. Each Defendant is liable for the violations it committed, authorized, aided, facilitated, or incited and for the resulting harm (L.A. Mun. Code, § 45.35(A)).

208. The acts and omissions alleged in this Claim were repeated acts or omissions of such significance as to substantially interfere with and disturb the comfort, repose, peace, and quiet of Plaintiffs. They caused, were likely to cause, or were committed with the objective to cause Plaintiffs to surrender or waive rights in relation to their tenancy, including their repair, credit, and habitability claims, their agency complaints, and the tenancy itself, which Plaintiffs surrendered on September 19, 2023 (§ 45.33(16)).

209. The violations proximately caused each Plaintiff injury, including economic loss, loss of residential use, substitute-housing and relocation expenses, property damage, discomfort, and emotional distress, in amounts according to proof. Plaintiffs seek relief for each separately committed violation. Each Plaintiff also seeks punitive damages under Civil Code section 3294, which section 45.35(E) preserves, for the malicious and oppressive conduct alleged above.

210. Each Plaintiff seeks compensatory damages, rent refunds for reduction in housing services, tenant relocation, reasonable attorney's fees and costs, and other appropriate relief under Los Angeles Municipal Code section 45.35(B), and prejudgment interest. Each Plaintiff also seeks, separately, the civil penalties that section 45.35(B) provides a prevailing tenant "may be awarded," "up to $10,000 per violation depending upon the severity of the violation," "as adjudged by the court."

211. Plaintiffs plead the specified violations as independent and alternative statutory grounds for this Claim and also plead the combined knowing and willful course of conduct as tenant harassment under section 45.33.

**SIXTEENTH CLAIM FOR RELIEF**

**Unfair Competition**

(Bus. & Prof. Code, §§ 17200, 17203)

(Against Northland and Greystar)

212. Plaintiffs incorporate paragraphs 4 to 10, 16 to 87, 89 to 101, 104 to 107, 110 to 116, 160 to 165, 168 to 172, 174, and 176 to 211.

213. Northland and Greystar engaged in unlawful and unfair business acts and practices within Business and Professions Code section 17200. Their practices were unlawful because they violated federal, state, and local law, including: (a) 15 U.S.C. section 1 and Business and Professions Code section 16720, by demanding and collecting the rent set through the conspiracy and trust; (b) Civil Code sections 1941 and 1941.1 and Health and Safety Code section 17920.3, by demanding and collecting rent for the Unit while failing to keep it habitable, including by leaving the violations the County and LADBS cited uncorrected; (c) Civil Code section 1942.4, subdivision (a), by Greystar's July 29 and August 24, 2023 demands, for Northland, of rent for the Unit while the cited conditions remained unabated; (d) Civil Code section 1942.5, by the retaliatory acts, including the withheld repairs and credits; (e) Los Angeles Municipal Code section 45.33, by the course of harassment; and (f) Los Angeles County Code sections 11.20.140, 11.20.160, and 11.20.170 and the Los Angeles Municipal Code provisions the County and LADBS cited, by leaving the cited violations uncorrected past each compliance deadline.

214. Each practice is also independently unfair. The practices violate established public policy, including the policies of Civil Code sections 1941, 1942.4, and 1942.5 and Los Angeles Municipal Code section 45.33, and are immoral, unethical, oppressive, and unscrupulous, and the injury they caused Plaintiffs outweighs any benefits. In the alternative, the injury was substantial, was not outweighed by any countervailing benefits, and was not one Plaintiffs could reasonably have avoided. The pricing conduct threatens an incipient violation of the Sherman

and Cartwright Acts and violates their policy and spirit. By these practices Northland and Greystar gained a competitive advantage over comparable landlords doing business in California that price independently and comply with their obligations to provide habitable premises.

215. Each Plaintiff suffered injury in fact and lost money or property as a result of these practices. He paid rent for the Unit to Greystar, which received each payment and collected it for THEA's owners, including Northland, and that rent included the antitrust overcharges and rent for days the Unit could not be occupied.

216. Plaintiffs seek restitution under Business and Professions Code section 17203 of rent actually received from them for days the Unit could not be occupied, including money corresponding to the promised affected-day credit, from Greystar and, alternatively, Northland. Each Plaintiff has an ownership interest in the rent he paid. This relief is pleaded in the alternative to damages under Federal Rule of Civil Procedure 8(d)(2) and (3). Plaintiffs lack an adequate remedy at law for the return of the rent Greystar received from them for days the Unit could not be occupied: Greystar is not sued on the lease, so the contractual claims against the Owner LLCs do not compel repayment from Greystar. Restitution, unlike the damages claims against Greystar, does not depend on proof that Greystar was the lessor or acted with intent or negligence, and no legal remedy pleaded here is as practical and efficient as restitution of the money Greystar itself received. Because Plaintiffs' legal remedies are inadequate to address the full scope of the unjust enrichment Greystar and Northland retained, Plaintiffs also seek, in the alternative, equitable restitution under Business and Professions Code section 17203 of all supracompetitive rent overcharges they paid for the Unit. Those legal remedies are inadequate because the First and Second Claims require proof of an agreement and, under the rule of reason, a relevant market and market power, while restitution under the unfairness ground of section 17200 requires none of them.

## PRAYER FOR RELIEF

Plaintiffs request judgment against the Defendants named in each Claim as follows:

A. On the First and Second Claims, judgment that the contract, combination, or conspiracy alleged violated Section 1 of the Sherman Act, 15 U.S.C. section 1, and Business and

Professions Code section 16720; jointly and severally, three times Plaintiffs' actual damages under 15 U.S.C. section 15(a) and Business and Professions Code section 16750, subdivision (a); simple interest on actual damages under 15 U.S.C. section 15(a); and interest under Business and Professions Code section 16761;

B. Compensatory damages according to proof, including rent paid and promised credits, loss of residential use and leasehold value, temporary and replacement housing, relocation and moving expenses, inspection and mitigation costs, property loss and damage, and discomfort and emotional distress; and, on the Twelfth Claim, nominal damages in the alternative;

C. On the Thirteenth Claim, each Plaintiff's actual damages and special damages of not less than $100 nor more than $5,000 under Civil Code section 1942.4, subdivision (b)(1);

D. On the Fourteenth Claim, each Plaintiff's actual damages under Civil Code section 1942.5, subdivision (h)(1), and punitive damages of not less than $100 nor more than $2,000 under subdivision (h)(2) for each retaliatory act committed against him with fraud, oppression, or malice;

E. On the Fifteenth Claim, each Plaintiff's compensatory damages, including emotional distress, rent refunds for reduction in housing services, tenant relocation, other appropriate relief, and civil penalties up to $10,000 per violation under Los Angeles Municipal Code section 45.35(B), as in effect in 2023;

F. On the Sixteenth Claim, restitution under Business and Professions Code section 17203 from Northland and Greystar, according to proof, of rent money received from Plaintiffs as a result of the unlawful or unfair practices alleged, including rent overcharges caused by the pricing combination and rent paid for days the Unit could not be occupied, including money corresponding to the promised affected-day credit;

G. Punitive damages under Civil Code section 3294 on the Fourth, Sixth, Ninth, and Twelfth Claims, and on the other noncontractual claims permitting that relief, based on the malicious and oppressive conduct alleged;

H. Attorney's fees under Civil Code sections 1942.4, subdivision (b)(2), and 1942.5, subdivision (i), Los Angeles Municipal Code section 45.35, subdivision (B), Business and Professions Code section 16750, subdivision (a), and 15 U.S.C. section 15(a), and against the

Owner LLCs under the lease and Civil Code section 1717 on the Third, Fifth, Seventh, and Eighth Claims;

I. Prejudgment interest under Civil Code sections 3287 and 3288 and the other statutes identified above; postjudgment interest under 28 U.S.C. section 1961; and costs of suit; and

J. Such other relief as the Court deems just and proper.

Plaintiffs plead alternative and cumulative grounds for relief under Federal Rule of Civil Procedure 8(d)(2) and (3).

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: October 19, 2026

**CLINE LEGAL SOLUTIONS LLC**

By: */s/ Diana S. Cline*
DIANA S. CLINE, ESQ.

*Attorney for Plaintiffs*
AARON GUHIN and
RON RUANGTRAGOOL

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and that service will be accomplished by via Email and to U.S. First Class Mail to the following.

| | |
|---|---|
| William A. Munoz<br>Kevin I. Kilroy<br>**FREEMAN MATHIS & GARY LLP**<br>550 S. HOPE STREET, 22ND FLOOR<br>LOS ANGELES, CA 90071<br>TEL. 213-615-7000<br><br>***Attorneys for Defendants***<br>NORTHLAND THEA PORTFOLIO LLC, NORTHLAND THEA LLC, NORTHLAND THEA IV LLC, NORTHLAND THEA PORTFOLIO II LLC, NORTHLAND THEA PORTFOLIO III LLC, and MATTHEW GOTTESDIENER | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court whose direction the service was made.

Executed on October 19, 2026

*/s/Diana S. Cline*
Diana S. Cline